STATE OF NORTH CAROLINA

DURHAM COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 2 4 C V S 1 2 1 8

FILED
2024 MAR -5 P 3:51
DURHAM CO., C.S.C
BY _____ cm

MONIQUE HOLSEY-HYMAN,

        Plaintiff,

v.

JARROD B. EDENS, EDENS
INVESTMENTS, INC., SARA M.
YOUNG, Individually and in her official
capacity as City of Durham Planning
Director, KIMBERLY M. REHBERG,
Individually and in her official capacity as
City Attorney for Durham, JILLIAN N.
JOHNSON, Individually and in her official
capacity as a member of the Durham City
Council, MARK A. MIDDLETON,
Individually and in his official capacity as a
member of the Durham City Council and
Mayor Pro Tempore, and THE CITY OF
DURHAM, a Municipal Corporation.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**

       NOW COMES Plaintiff Monique Holsey-Hyman and complaining of Defendants, alleges and says as follows:

**PARTIES**

       1.     Plaintiff Monique Holsey-Hyman ("Plaintiff" or "Dr. Holsey-Hyman") is a citizen and resident of Durham, Durham County, North Carolina. At all times alleged herein, Dr. Holsey-Hyman was a member of the Durham City Council.

       2.     Jarrod B. Edens ("Mr. Edens") is a citizen and resident of Raleigh, Wake County, North Carolina.

3.     Edens Investments, Inc. ("Edens Investments") is a corporation duly organized and existing under the laws of the state of North Carolina. Jarrod Edens is the manager, owner, and operator of Edens Investments. At all times alleged herein, Jarrod Edens and Edens Investments owned and managed numerous large real property developments in Durham County and the surrounding areas.

4.     Sara M. Young ("Ms. Young") is a citizen and resident of Durham, Durham County, North Carolina. At all times alleged herein, Ms. Young was employed by the City of Durham, North Carolina as the City Planning Director. At all times relevant to the events described in this Complaint, Ms. Young was acting within the course and scope of her official duties and under color of state law. Ms. Young is both individually and in her official capacity responsible for the constitutional violations and torts that are alleged herein. This Complaint is brought against Ms. Young in her individual capacity under 42 U.S.C. § 1983 and in her individual and official capacities under North Carolina Law.

5.     Kimberly M. Rehberg ("Ms. Rehberg") is a citizen and resident of Raleigh, Wake County, North Carolina. At all times alleged herein, Ms. Rehberg was employed by the City of Durham, North Carolina as the City Attorney. At all times relevant to the events described in this Complaint, Ms. Rehberg was acting within the course and scope of her official duties and under color of state law. Ms. Rehberg is both individually and in her official capacity responsible for the constitutional violations and torts that are alleged herein. This Complaint is brought against Ms. Rehberg in her individual capacity under 42 U.S.C. § 1983 and in her individual and official capacities under North Carolina Law.

6.     Jillian N. Johnson ("Ms. Johnson") is a citizen and resident of Durham, Durham County, North Carolina. At all times alleged herein, Ms. Johnson was employed by the City of Durham, North Carolina as a member of the Durham City Council. At all times relevant to the

events described in this Complaint, Ms. Johnson was acting within the course and scope of her official duties and under color of state law. Ms. Johnson is both individually and in her official capacity responsible for the constitutional violations and torts that are alleged herein. This Complaint is brought against Ms. Johnson in her individual capacity under 42 U.S.C. § 1983 and in her individual and official capacities under North Carolina Law.

7.      Mark A. Middleton ("Mr. Middleton") is a citizen and resident of Durham, Durham County, North Carolina. At all times alleged herein, Mr. Middleton was employed by the City of Durham, North Carolina as a member of the Durham City Council and as Mayor Pro Tempore. At all times relevant to the events described in this Complaint, Mr. Middleton was acting within the course and scope of his official duties and under color of state law. Mr. Middleton is both individually and in his official capacity responsible for the constitutional violations and torts that are alleged herein. This Complaint is brought against Mr. Middleton in his individual capacity under 42 U.S.C. § 1983 and in his individual and official capacities under North Carolina Law.

8.      The City of Durham, North Carolina ("City") is a municipal corporation chartered and organized under the laws and Constitution of the State of North Carolina. It is capable under the law of bringing and defending lawsuits, including claims by and against its employees, agents, attorneys, and councilmembers.

9.      The City of Durham is located in Durham County, North Carolina.

10.     As a North Carolina municipal corporation, the City of Durham is vested with all of the corporate rights, powers, and capacities that are set forth in N.C. Gen. Stat. § 160A-11, including but not limited to, the powers and capacities to sue and be sued.

11.     Pursuant to N.C. Gen. Stat. § 160A-146, the Durham City Manager is responsible for administering the city's municipal affairs. The Durham City Manager is appointed by and serves at the pleasure of the Durham City Council.

12.    Among the many powers of the Durham City Manager are the powers and duties to direct and supervise the administration of all city departments and offices, including the Planning Department and the City Attorney's Office.

13.    The Durham City Council is the legislative body for the City of Durham. Its members are the community's decision makers. The City's power is centralized in the elected council members. The City Council can hire and fire the city manager, sets the budget, and makes all planning, traffic, law and order, public works, finance and recreation decisions. It can levy taxes, collect revenues and make appropriations. It can hire and fire the City Attorney and the City Planning Director. In effect, the City Council is the City.

14.    The City Planning Director, the City Attorney, and all members of City Council are agents and employees of the City of Durham.

15.    At all times alleged herein and at all other times relevant to this action, the City of Durham either acted or failed to act, as alleged herein, through its officials, managers, policymakers, and/or employees—including, but not limited to the City Planning Director, the City Attorney, and the City Council members—whose acts, edicts, and practices represent the official policies, practices, and customs of the City of Durham.

16.    Further, City Council members are supervisors, officers, managers, and final policymakers. Their actions are the actions of the City of Durham. The City of Durham is also liable for the injuries and damages resulting from the actions/inactions of the City Council member Defendants alleged herein because as final policymakers for the City of Durham, they were themselves the direct participants and inflictors of the deprivation of Dr. Holsey-Hyman's constitutionally protected rights.

4

17.     The City of Durham is liable for the injuries and damages resulting from the actions of the Planning Director and City Attorney Defendants because their actions/inactions alleged herein were ratified by the City Manager and/or the City Council member Defendants.

18.     The City of Durham is responsible for Dr. Holsey-Hyman's injuries and damages under 42 USC § 1983 because its official policies, practices, customs, and/or usages wrongfully caused Dr. Holsey-Hyman's injuries and losses.  The City of Durham is also liable for the constitutional violations alleged herein in that it ratified and adopted the wrongful actions and practices of the City Planning Director, City Attorney, and the City Council members alleged herein.  The City of Durham is also liable in this action both for direct negligence, and for the defamatory and other tortious conduct of its agents, servants, and employees under the theories of agency, vicarious liability, and *respondeat superior*.

## WAIVER OF IMMUNITY

19.     Upon information and belief, the governmental Defendants do not have governmental or sovereign immunity for any of the acts or omissions that are described herein.

20.     In the alternative, should any of the governmental Defendants ordinarily possess governmental and/or sovereign immunity from civil liability for any of the acts or omissions that are described herein, upon information and belief, the governmental Defendants are insured by one or more policies of liability insurance purchased pursuant to N.C. Gen. Stat. § 153A-435, § 160A-485, or other applicable state law with respect to all acts and omissions complained of herein, or participate in a government risk pool pursuant to N.C. Gen. Stat. § 58-23-5, or maintain a funded reserve and to such extent, the governmental Defendants have waived any official, sovereign, qualified or governmental immunity to which they might otherwise be entitled in their official capacities.

5

21.     In committing the acts and omissions that are alleged herein, the governmental Defendants acted knowingly, maliciously, corruptly, and with a callous and reckless disregard for the rights of Dr. Holsey-Hyman, all of which justifies the imposition of personal liability for the wrongful acts alleged herein, as well as an award of punitive damages against them in their individual capacity.

## JURISDICTION AND VENUE

22.     The Court has subject matter jurisdiction over this action under and by virtue of, *inter alia*, N.C.G.S. § 7A-240 and N.C.G.S. § 7A-243 and N.C.G.S § 1-253 *et seq*.

23.     The Court has personal jurisdiction over Defendants under and by virtue of, *inter alia*, N.C.G.S. §1-75.4.

24.     Venue is proper in this Court under by virtue of, *inter alia,* N.C.G.S. §1-79 and §1-82.

## FACTS

### I.     Background.

25.     Dr. Holsey-Hyman was born and raised in South Bronx, New York.  She received her Bachelor of Sciences degree in Human Services and Sociology from State University at Binghamton in 1986. She received a Masters of Social Work from Columbia University in 1992, and she received a Doctorate in Education Leadership and Administration from Walden University in 2015.

26.     Dr. Holsey-Hyman is a wife, mother, and community activist passionate about education, social work, and community service. Over the past 25 years, Dr. Holsey-Hyman has worked in child welfare, mental health, and community healthcare and management, with 17 years of administrative and academic leadership.  She has worked and taught at numerous distinguished institutions, including Berkeley College in New York, Fordham University and Columbia

6

University in New York City, Shaw University in Raleigh, Simmons University in Boston, Walden University in Minnesota, and North Carolina Central University in Durham.

27.    Since 2006, she has lived in Durham. She worked at Shaw University in various capacities from 2006 to 2018. Since 2018, she has worked as a professor at N.C. Central University. During this time, she has also worked remotely as an adjunct professor at Simmons University.

28.    Dr. Holsey-Hyman has received numerous different awards and accommodations throughout her distinguished career. Just during the time that she has been at N.C. Central University, Dr. Holsey-Hyman has received the 2019 Crystal Eagle Excellence Award for outstanding social work faculty, the 2021 N.C. Central University Excellence in Teaching and Mentoring Student Success Award, the 2022 N.C. Central University Department of Social Work Innovative Mentoring Award, and the 2022 N.C. Central University College of Arts, Social Sciences, and Humanities Social Work Department Excellence in Teaching Award. She has received and been nominated for many other awards and accommodations.

29.    Dr. Holsey-Hyman has been appointed to numerous different education, healthcare, and community service boards and committees everywhere she has lived.

30.    Dr. Holsey-Hyman has authored or co-authored numerous publications covering black history, education, social work, and civil rights.

31.    Apart from her family, which is most important to her, Dr. Holsey-Hyman is, first and foremost, an educator and passionate social worker. Her career accomplishments speak for themselves. At all times alleged herein, each and every Defendant named in this lawsuit was fully aware of Dr. Holsey-Hyman's distinguished background and her career accomplishments.

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 7 of 68

32.     In early 2022, Dr. Holsey-Hyman was approached by colleagues to consider applying for the open seat on the Durham City Council ("Council") left vacant by the resignation of Council Member Charlie Reece.

33.     Dr. Holsey-Hyman had never held a political office, and she had never previously run for political office. However, she has rarely said no to any meaningful opportunity to serve or give back to her community. Dr. Holsey-Hyman had grown to truly love the community of Durham. The idea of serving on the Durham City Council and being able to reach and impact a wider range of people with her "education first" message was appealing to her. So, Dr. Holsey-Hyman agreed and submitted her application as a candidate for the Durham City Council.

34.     Dr. Holsey-Hyman was unanimously chosen among the existing council members, and on May 12, 2022, Dr. Holsey-Hyman was sworn in as the newest Durham City Council member.

35.     As referenced above, Dr. Holsey-Hyman's background is in education, healthcare, and social work. A large percentage of the work performed by the Council is related to property management/development issues. Dr. Holsey-Hyman was not as familiar with property issues as she was with the education and social work issues that came before the Council. She relied on her fellow council members to provide her some background knowledge and guidance as to the various property issues the Council routinely dealt with.

36.     Fairly quickly, Dr. Holsey-Hyman learned that there was a group of four council members that routinely voted for development regardless of the potential adverse impact to the people of Durham—Defendant Mayor Pro Tempore Mark Middleton, Defendant Jillian Johnson, Leonardo Williams, and Javiera Caballero.

37.     The other two council members, Mayor Elaine O'Neal and DeDreana Freeman, frequently voted against large development projects.

8

38.     With each development project that came before the Council, Dr. Holsey-Hyman tried to understand the reasons for development, the need for the development, and the impact the development was going to have on the existing community.  She often voted no for development projects, but her vote was not a rubber stamp either way.  She took each development issue that came before the Council one-by-one.

39.     Dr. Holsey-Hyman began to see that Council members Middleton, Williams, Johnson, and Caballero (which were referred to within City staff and which are hereinafter sometimes referred to as "the group of four") were very close with the builders and developers that came before the Council.  They frequently had individual meetings and lunches together.  On several occasions, Council member Williams told Dr. Holsey-Hyman that she was voting too passionately and that she needed to vote more "politically" in favor of building if she wanted to stay on the council.

40.     Upon information and belief, when Council members Williams and Middleton were first elected to the City Council, they ran on anti-development platforms; however, after they were on the Council and after they had meetings with the different developers, they started supporting development.

41.     The developers and builders that frequently came before the Council also had close relationships with other City staff members, specifically the City Planning Director, Defendant Sara Young.

42.     The Planning Director's department was intended to serve as a gatekeeper for development projects brought before the Council; however, in recent years, the Planning Director seemed to be controlled by the private builders and developers.  Upon information and belief, it was difficult for anyone to get an appointment with Ms. Young except for the big-name developers. In fact, some recently proposed changes to the City's development codes and zoning regulations

9

that the Planning Director had submitted or was in the process of submitting to the Council had in fact been drafted by local developers and builders.[1]

43.    Upon information and belief (especially given her subsequent actions described herein) the City Attorney, Defendant Rehberg, had grown familiar with and was supportive of developers that came before the Council.[2]

44.    There was a growing sense of arrogance among the group of four, along with Ms. Young and Ms. Rehberg, that development plans brought before the Council should be approved and that fellow council members that voted against development plans brought before the Council either did not know enough about the issue, were voting purely on passion, or just should not be on the Council.

II.    **The March 6, 2023 City Council Meeting.**

45.    The City Council was scheduled to have a public meeting on the evening of Monday, March 6, 2023.

46.    On the agenda for the March 6, 2023 meeting was a request for a utility extension agreement, voluntary annexation and zoning map change submitted by Defendants Jarrod Edens and Edens Investments for one parcel of land totaling approximately 132 acres located at 2621 Burton Road and commonly known as the Carpenter Falls Development. (Hereinafter referred to as the "Carpenter Falls Development" or "Carpenter Falls Annexation").

47.    Mr. Edens and Edens Investments stated in their application that they intended to develop the property as a 235 single-family unit subdivision.

---

[1] The Durham Simplified Code for Affordable Housing (SCAD) had primarily been drafted by the attorneys/engineers of local developers.
[2] Upon information and belief, Ms. Rehberg had also recently requested a raise and/or promotion that Council member Middleton and some of the other group of four supported, while Mayor O'Neal and Council members Freeman and Holsey-Hyman did not. So, Ms. Rehberg was upset and/or frustrated with Dr. Holsey-Hyman for her own financial reasons.

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 10 of 68

48.     A majority of the Council had to vote for the annexation in order for it to be approved. If the Carpenter Falls Annexation were to be approved, upon information and belief, Mr. Edens and Edens Investments were going to sell the property to another developer who would then immediately start work on grading and developing the property.

49.     If the Carpenter Falls Annexation did not pass, then Mr. Edens and Edens Investments would not be able to sell the property. Mr. Edens and Edens Investments stood to lose a significant amount of money if the annexation was not approved by a majority of the Council.

50.     As previously referenced, the group of four—Council members Middleton, Williams, Johnson, and Caballero were supportive of development. They were all aware of the Carpenter Falls Annexation and were very anxious to push the annexation forward. The other Council members, Mayor O'Neal, Freeman, and Holsey-Hyman, all felt that they needed more time to look at the development more closely and wanted more time. They did not understand the rush.

51.     Upon information and belief, Mr. Edens had previously contacted, directly and/or indirectly, the group of four and had confirmed that all four were supportive of the Carpenter Falls Annexation. Mr. Edens was confident that if all four of the group of four were to come to the meeting, the annexation would pass.

52.     Shortly before the March 6, 2023 City Council meeting, it became known that Council member Johnson would not be present at the meeting. If the vote on the annexation were to end in a 3-3 tie, then the annexation would not pass.

53.     Mr. Edens was made aware of the fact that Council member Johnson was not going to be present at the meeting.

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 11 of 68

54. Mr. Edens needed one more vote. He knew that Mayor O'Neal and Council member Freeman were not going to be swayed.

55. Upon information and belief, one or more of the group of four advised Mr. Edens to contact Dr. Holsey-Hyman.

56. On the morning of March 6, Mr. Edens tried to contact Dr. Holsey-Hyman. He sent her emails and left voicemail messages. However, Dr. Holsey-Hyman had a full day of meetings and conference calls. Her schedule was full. Because her schedule was full, and she was busy going from meeting to meeting, she was not aware that Mr. Edens was trying to contact her.

57. Dr. Holsey-Hyman shared the same administrative assistant with Council member Williams, Rachel Ruterbories.

58. Ms. Ruterbories was made aware, either by Council member Williams or by Mr. Edens, that Mr. Edens was trying to contact Dr. Holsey-Hyman before that night's Council meeting.

59. Around mid-morning on the 6th, Ms. Ruterbories called Dr. Holsey-Hyman and told her that Mr. Edens was trying to get up with her. Ms. Ruterbories asked her to please call Mr. Edens between her 11:00 am and 1:00 pm meetings.

60. Dr. Holsey-Hyman called Mr. Edens around 12:00 noon on the 6th. She informed Mr. Edens that she was very busy working on Council matters and on a project at N.C. Central University. She also informed Mr. Edens that she had just recently decided to run for reelection on the City Council and that her kickoff event was going to be that weekend, March 12.

61. Mr. Edens stated that he wanted to support Dr. Holsey-Hyman in her endeavors of running for City Council. Dr. Holsey-Hyman responded jokingly that she did not think he could support her because she did not want to go to jail. She then laughed, and so did Mr. Edens.

12

62. Mr. Edens then talked about the fact that he sponsored a football team with many African American boys and that he thought that the parents and children would be able to support Dr. Holsey-Hyman at her kickoff event coming up on the 12th. Mr. Edens also asked Dr. Holsey-Hyman to speak at his football team's awards banquet.

63. Mr. Edens then brought up the Carpenter Falls Annexation that was going to be before the Council later that evening. Dr. Holsey-Hyman asked him questions about blasting, how many units there were going to be in the development, and whether there were going to be any affordable housing or other proffers made to the City in his proposal. Mr. Edens never asked Dr. Holsey-Hyman to vote a certain way on the annexation proposal. Dr. Holsey-Hyman never stated she was going to vote a certain way on the annexation proposal. Dr. Holsey-Hyman never implied she was going to vote a certain way on the annexation. She absolutely never stated or implied she would vote yes for the annexation in exchange for any contribution or other favors from Mr. Edens. Dr. Holsey-Hyman made contemporaneous notes of her conversation with Mr. Edens.

64. After the call ended, Dr. Holsey-Hyman texted Mr. Edens the announcement for her campaign and the upcoming March 12, 2023 kickoff event.

65. At the City Council meeting later that evening, the Carpenter Falls Annexation came up on the agenda. The details of the annexation were presented to the Council by a staff member of the City Planning Department. Next, Mr. Edens gave a presentation regarding the proposed development. Then various citizens spoke about the development. Most citizen comments were in opposition to the development. One of the citizens expressed concern that the

13

City Council was rushing through the process, and she did not understand why. She exclaimed, "What's the rush?"[3]

66. Then, some of the council members spoke about the development. Dr. Holsey-Hyman asked Mr. Edens some questions about the project, addressing the same issues she had expressed with Mr. Edens in their conversation earlier in the day. When Defendant Mayor Pro Tem Middleton spoke, he expressed strong support for the development and expressed frustration, in a surprisingly arrogant manner, that any council member could possibly vote no on the development. At this point, he knew that Jillian Johnson was not present, and he knew that Mayor O'Neill and Council member Freeman were likely going to be voting no. He now sensed that Dr. Holsey-Hyman was also going to vote no, meaning the annexation vote was going to fail. He stated: "this is so perfunctory that the planning commission doesn't take a vote on it;" "this is almost a lay-up for us;" "I don't think I have ever seen this much opposition to a direct translation vote;" "we don't get many lay-ups on the city council;" and "this has historically been perfunctory."

67. The final vote on the Carpenter Falls Annexation was a 3-3 tie, so the annexation failed to pass. O'Neill, Freeman, and Holsey-Hyman voted no; Middleton, Williams, and Caballero voted yes.

68. Shortly after the vote failed, Mr. Edens exited the Council chambers, visibly frustrated. Mr. Middleton was seen talking on his cell phone very shortly after the meeting concluded.

---

[3] In fact, the rush was that, upon information and belief, as referenced above, as soon as the Carpenter Falls Annexation was approved, Mr. Edens and Edens Investments were going to convey the property to another developer/builder who was then going to perform the development building work. Mr. Edens and Edens Investments stood to lose a substantial amount of money for every day that the Carpenter Falls Annexation was not approved. All Defendants to this action knew this.

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 14 of 68

### III. Edens' Frustration and Overzealous Desire to Get His Project Approved by the Council as Quickly as Possible Fuels Motive to Make False and Defamatory Accusations of Extortion.

69.     The next day, Tuesday March 7, 2023, Mr. Edens sent an email to Dr. Holsey-Hyman, saying, "let's check in." Dr. Holsey-Hyman was very busy with her work and also organizing her campaign kickoff event which was to be held the upcoming weekend. She did not see the email and did not respond.

70.     Mr. Edens sent another email to Dr. Holsey-Hyman the next day, Wednesday March 8, again asking if they could "check in." Again, Dr. Holsey-Hyman did not see this email and did not respond.

71.     On the morning of Saturday March 11, 2023, Defendant Mr. Edens called Defendant Sara Young, the City Planning Director, and told Ms. Young that Dr. Holsey-Hyman had told him in their telephone conversation on March 6 that in order to obtain support for his Carpenter Falls development project, he would need to make a contribution to her campaign for reelection.

72.     This accusation was categorically false, and Mr. Edens knew this accusation was false. Upon information and belief, Mr. Edens made this accusation with malicious intent in retaliation for Dr. Holsey-Hyman not voting yes for his development project.

73.     As Ms. Young knew, and as Mr. Edens knew (and as everyone on and/or associated with the City Council knows), this was an accusation of extortion, which is a felony. There is no more serious and damaging accusation that can be lodged against a sitting council member.

74.     Upon information and belief, Mr. Edens called Ms. Young to make this false accusation against Dr. Hosley-Hyman because he was very upset that his development annexation had not passed, and he was going to lose a lot of money as a result. He also now knew that Dr.

15

Holsey-Hyman was running for reelection. He now knew that she was likely not going to be supportive of developments in the future, and he wanted her off the Council.

75.     Mr. Edens did not call the police, which is what one would normally do to report a crime. Instead, he called Ms. Young, because he had a close relationship with Ms. Young, he knew she liked him, he knew that she supported his development, and he knew that she was also very frustrated that Dr. Holsey-Hyman had voted no for the Carpenter Falls Annexation. Upon information and belief, he wanted to provide some fabricated "ammunition" for his friends on the Council, that were also upset and frustrated with Dr. Holsey-Hyman's "no" vote, to force Dr. Holsey-Hyman to resign and/or to decide against running for reelection.

76.     Mr. Edens told Ms. Young that he did not want his name disclosed, he wanted his name to be kept confidential. So, he wanted Dr. Holsey-Hyman punished, humiliated, and to be removed from the Council, but he did not want his name to be revealed at all. He knew that his friend, Sara Young, would try to keep his name confidential.

77.     The fact that Mr. Edens told Ms. Young that he wanted to keep his name confidential should have been a clear red flag to Ms. Young that he was not being truthful. Ms. Young knew that any accusation of extortion would have to be investigated, and the name of the accuser would have to be revealed. The fact that Mr. Edens was saying he didn't want his name to be revealed meant that Mr. Edens didn't want to be interviewed by police or anyone else about the matter; he just wanted to "plant the seed" within the City. Again, this should have been, and very likely was, a clear indication to Ms. Young that the accusation had no merit.

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 16 of 68

**IV.** **Defendants Young and Rehberg Repeat and Make Public False and Defamatory Accusations and Implications of Extortion with a Complete Disregard as to Whether the Accusations Were True, Fueled by Frustration with Dr. Holsey-Hyman and an Effort to Retaliate.**

78.     Ms. Young received the aforementioned call from Mr. Edens on the morning of Saturday March 11, 2023. Despite the seriousness of the allegation, Ms. Young did not call Dr. Holsey-Hyman to ask for her side of the story. She knew Dr. Holsey-Hyman and knew of her background and credentials. She knew how preposterous it would be for an educator with Dr. Hosley-Hyman's esteemed background to risk her entire career and livelihood over a vote on a property development annexation to which she had no personal connection or involvement.

79.     Ms. Young knew that Mr. Edens had a lot to lose as a result of Dr. Holsey-Hyman's "no" vote; she knew Mr. Edens had a real motive to try to get Dr. Holsey-Hyman removed from the Council and to get his project back before the Council and approved as soon as possible. She knew there was a strong likelihood that Mr. Edens was not telling the truth; however, she disregarded this belief. Upon information and belief, she saw this accusation of extortion, as Mr. Edens was anticipating she would do, as an opportunity to silence or remove a likely "no" vote for future development projects that came before the Council.

80.     Ms. Young did not call the police, just as Mr. Edens had not called the police. Mr. Edens had told her to keep his name confidential, and she certainly was going to abide by his wishes.

81.     On the evening of March 12, 2023 Ms. Young called the City Attorney, Defendant Kimberly Rehberg, and reported to her the conversation she had had with Mr. Edens the day before. Approximately 30 hours passed after Mr. Edens called Ms. Young before Ms. Young called Ms. Rehberg. Upon information and belief, in the interim, Ms. Young may have had other

17

conversations about this matter with some City council members and with other City employees; however, she has not yet disclosed these conversations.

82.     Ms. Young has stated that she did not keep any notes whatsoever of her conversation with Mr. Edens. This was one of the most important phone conversations Ms. Young had ever had in her job, regarding information that could potentially ruin Dr. Holsey-Hyman's career, and she allegedly kept no notes. Upon information and belief, Ms. Young did not keep notes in order to attempt to comply with Mr. Edens' demands that his name be kept confidential, and because she had serious concerns about the truth of what Mr. Edens was saying. Or, Ms. Young kept notes that have since been destroyed.

83.     Despite knowing how unlikely it was that Dr. Holsey-Hyman would have committed extortion, and knowing all of the motives Mr. Edens had to lie or grossly misrepresent the nature of his conversations with Dr. Holsey-Hyman in attempt to get her in trouble and removed from the Council, Ms. Young repeated the accusation that Dr. Holsey-Hyman had attempted to extort a campaign contribution from Mr. Edens in exchange for a yes vote on his project to the City Attorney, Ms. Rehberg.

84.     In the alternative, Ms. Young intentionally, grossly, and falsely exaggerated and misrepresented what Mr. Edens told her when she relayed what had transpired to Ms. Rehberg.

85.     Ms. Rehberg was also frustrated with Dr. Holsey-Hyman's "no" vote on the Carpenter Falls Annexation. Ms. Rehberg also believed that Dr. Holsey-Hyman was not supportive of her receiving a raise. (See, footnote 2, supra.)

86.     Ms. Young knew that Ms. Rehberg was frustrated with Dr. Holsey-Hyman, which, upon information and belief, is partly why Ms. Young contacted Ms. Rehberg instead of her immediate supervisor.

18

87.     Just like Ms. Young, Ms. Rehberg was very aware of Dr. Holsey-Hyman's distinguished career and background in education and social work.  Just like Ms. Young, Ms. Rehberg knew how preposterous it would be for Dr. Holsey-Hyman to commit extortion and risk ruining her entire career over a vote on a property development project to which she had no personal connection or involvement.  A Class F felony had been reported as having been committed, yet, she did not call the police or the SBI, she did not call Dr. Holsey-Hyman to get her side of the story as to what happened, she did not call Mr. Edens to ask him more questions about what happened and to try to clarify exactly what was said, and she did not call the Mayor.

88.     Instead, she called Defendant Mayor Pro Tem Mark Middleton.

89.     Upon information and belief, she called Mr. Middleton because she knew that Mr. Middleton was also frustrated with Dr. Holsey-Hyman's "no" vote, because she knew Mr. Middleton was close with Mr. Edens, and  because she knew that Mr. Middleton was frustrated with Dr. Holsey-Hyman's resistance to Ms. Rehberg receiving a raise.

A.  Defendant Rehberg's March 13, 2023 Letter.

90.     After consultation with Mr. Middleton, and without consulting with Mayor O'Neal, the next day, on March 13, 2023, Ms. Rehberg sent by email a letter to all of the City Council members, a letter that she knew would immediately be a matter of public record and available to the press, containing numerous false and defamatory statements and insinuations that were intended to embarrass and humiliate Dr. Holsey-Hyman and were intended to forever harm Dr. Holsey-Hyman's reputation.  A true and accurate copy of this letter is attached hereto as Exhibit A.

91.     In writing the letter, upon information and belief, Ms. Rehberg intended to embarrass Dr. Holsey-Hyman because she had voted no on the Carpenter Falls Annexation, and Ms. Rehberg intended to give necessary "ammunition" to the other Councilmembers so that they

could take actions to remove Dr. Holsey-Hyman from the Council or to otherwise stop her from voting no on future development projects that were to come before the Council. Ms. Rehberg also intended to embarrass Dr. Holsey-Hyman because she had been resistant to Ms. Rehberg receiving a raise.

92.    While Ms. Rehberg does not disclose Dr. Holsey-Hyman's name on the face of the letter, it was very clear she was referring to Dr. Holsey-Hyman. Ms. Rehberg knew that all recipients of the letter either already knew, or would quickly find out, that the subject of the letter was Dr. Holsey-Hyman.

93.    It should be emphasized that Ms. Rehberg is a lawyer. People are going to assume that statements made by a lawyer have been vetted, researched, and investigated. Ms. Rehberg knew this. She knew that the statements she made in her letter were going to be believed by the Council members. The statements Ms. Rehberg made in her letter were intended to convey, and did in fact convey, the message that Dr. Holsey-Hyman was in fact guilty of extortion, when in fact Ms. Rehberg knew it was extremely unlikely that someone of Dr. Holsey-Hyman's background and career would commit such a serious crime. In writing this letter, Ms. Rehberg intentionally implied the existence of an undisclosed false and defamatory statement of fact—that Dr. Holsey-Hyman was guilty of extortion.

94.    Ms. Rehberg is the attorney for the City Council. Dr. Holsey-Hyman is on the City Council. Dr. Holsey-Hyman was her client.[4]

95.    Ms. Rehberg started her letter by attempting to explain and justify why she was writing the letter in the first place (when she in fact had no legitimate reason to write the letter).

---

[4] It should be noted that Ms. Rehberg had recently represented Council member Caballero, individually, in federal court. Despite this, Ms. Rehberg was now apparently deciding unilaterally that she had no ethical or legal obligation or duty whatsoever towards Council member Holsey-Hyman.

She started her letter with a citation from the North Carolina State Bar Rules of Professional Conduct:

> If a lawyer for an organization knows that an officer, employee, or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, **or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization,** then the lawyer shall proceed as is reasonably necessary in the best interests of the organization. Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization. . . .

(The emphasis in bold was added by Ms. Rehberg.)

96.  So, Ms. Rehberg started out her letter by explaining that the only reason she is writing the letter is because she **"knows that an officer, employee, or other person is engaged in . . . a violation of law . . ."** Based on her citation of this Rule, there would be absolutely no reason for her to write the letter unless she **knew** someone had broken the law. Including this citation was clearly intended to convey the message, and did in fact convey the message, that the person to whom she was describing in the letter was in fact guilty. This insinuation was false and defamatory. She knew that Dr. Holsey-Hyman had only been accused, she had not yet spoken to either Dr. Holsey-Hyman or to Mr. Edens, and she also knew that it was highly unlikely that Dr. Holsey-Hyman would have committed extortion.

97.  In the letter, Ms. Rehberg then went into a summary of her conversation with Defendant Ms. Young regarding Ms. Young's conversation with Mr. Edens and stated, "the developer contends that during one of these meetings, the developer was informed that, in order to obtain support for their project (i.e. a 'yes' vote on the application), they would need to make a contribution to that councilmember's campaign."

21

98. By repeating this accusation, Ms. Rehberg published a false and defamatory statement knowing it was false or with a reckless disregard as to whether the statement was false.

99. In the alternative, Ms. Rehberg intentionally, grossly, and falsely exaggerated and misrepresented what Ms. Young and/or Mr. Edens had said regarding what had transpired.

100. In the letter, Ms. Rehberg did state that she does not know if the allegation is true, but she repeatedly includes extremely strong and accusatorial language that would not otherwise have been used unless she was attempting to imply that the accused is in fact guilty:

a. *"I find it extremely alarming that such an allegation has been made about a member of the Durham City Council."*

b. *"More importantly, the Councilmember who requested a campaign contribution in exchange for voting a certain way, if that occurred, . . ."*

   It should be emphasized that, here, Ms. Rehberg made the affirmative statement "the Councilmember who requested a campaign contribution in exchange for voting a certain way . . ." which is clearly an affirmative statement of fact. Ms. Rehberg followed it up with "if that occurred," but that qualifier comes after the damaging false and defamatory statement of fact has been made. Ms. Rehberg's intent was to convey the message that the Councilmember was guilty.

c. She attached a copy of the general statute regarding extortion and emphasized it is a Class F Felony. There was no need for Ms. Rehberg to attach a copy of the statute unless she was intending to convey the message the accused was guilty.

d. She then made the comment, *"while I do not have a legal obligation to defend individual City Councilmembers in actions involving personal criminal conduct . . ."* Again, this is clearly implying that Dr. Holsey-Hyman has in fact been involved in personal criminal conduct.

e. She then stated, *"It should go without saying that no member of the City Council should ever demand or accept anything of value in connection with engaging in any action or activity that is a part of the official duties of the office."*

   In this statement, as with numerous other statements in the letter, Ms. Rehberg appears to be lecturing the City councilmembers, as if she is a seventh-grade teacher lecturing her students (which is not done unless the teacher believes inappropriate conduct has in fact occurred). This type of lecturing about inappropriate conduct is a clear implication that inappropriate conduct has occurred.

22

f. Ms. Rehberg follows up this lecturing with the statement, *"I suggest that any Councilmember who has engaged in such activity consult their own personal lawyer."*

Again, this is another statement that Ms. Rehberg included to intentionally convey the message that Dr. Holsey-Hyman has in fact engaged in criminal activity.

g. Ms. Rehberg started the next paragraph with *"the developer who reported the above-described conversation to Director Young also reported . . . ."* and then goes on to discuss that the developer believed there were separate text chats going on between councilmembers during open Council meetings.

In this statement there is no qualifier that the conversation (between the developer and Dr. Holsey-Hyman) may not have occurred, or that the conversation did not occur in the manner that the developer reported. This statement implies as a foregone conclusion that the conversation occurred as reported, and then Ms. Rehberg is moving on to another issue.

101. Seeming to have decided that this was now the opportunity to throw as many unwarranted accusations at Dr. Hosley-Hyman as she possibly could, Ms. Rehberg then discussed the fact that a city employee had been recently disciplined for engaging in campaign-related activities for a current City councilmember while on the job. Ms. Rehberg referenced and attached numerous statutes prohibiting this activity. She does not state that the councilmember is Dr. Holsey-Hyman, but that is exactly who she is referring to, and the recipients of the letter either already knew or were quickly able to determine this. Ms. Rehberg finished this section of the letter with, *"my hope is that Councilmembers will appreciate the sensitive position of City employees and refrain from requesting that City Staff engage in campaign related activities while working in an official role for the City. . . ."*

102. The referenced campaign-related activity consisted of the City employee forwarding an invitation to a friend during work hours. At the time that Ms. Rehberg wrote this letter, the referenced City employee had already been disciplined, and the employee had gone on record stating that he had acted on his own. There was no evidence that Dr. Holsey-Hyman had requested the staffer to send the message during work hours. Ms. Rehberg knew this at the time

23

that she wrote the letter. Yet, she took it upon herself to lecture the Council, i.e., Dr. Holsey-Hyman, to "refrain from requesting . . ."; again, intending to convey the message that Dr. Holsey-Hyman had in fact "requested" the inappropriate assistance from the employee, which was false and defamatory.[5]

103. In writing the letter, it was Ms. Rehberg's intent to directly and impliedly convey the message that Dr. Holsey-Hyman was guilty of extortion and also guilty of this campaign violation. Council members receiving the letter in fact understood Ms. Rehberg's message to be that Dr. Holsey-Hyman was guilty. Specifically, upon information and belief, Council member Caballero stated to Council member Freeman that she believed Dr. Holsey-Hyman was guilty of extortion after reading the letter.

104. At the time that Ms. Rehberg wrote the letter, she knew Dr. Holsey-Hyman had not committed extortion or that it was highly unlikely she had committed extortion. She knew that she had not committed any campaign violation. Ms. Rehberg published the letter with a reckless disregard for the truth of the direct and implied defamatory statements contained therein and with an ulterior motive or intent to embarrass Dr. Holsey-Hyman because she had voted no on the Carpenter Falls Annexation, to potentially silence her from voting no on future development projects, and to embarrass her for having resisted her request for a raise.

105. The City Manager, Wanda Page, was aware of the letter, reviewed the letter, and condoned the publishing of the letter including the direct and implied defamatory statements contained therein.

---

[5] This City staffer issue is discussed in more detail starting at Paragraph 133, <u>infra.</u>

B. Defendant Middleton Demands Dr. Holsey-Hyman's Resignation.

106. As referenced above, in her March 13, 2023 letter, Ms. Rehberg appeared to be keeping confidential the name of the council member (i.e., Dr. Holsey-Hyman) that was accused of extortion, and she also appeared to be keeping Mr. Edens' name confidential. However, before the letter was sent, she spoke directly to Defendant Middleton about the matter and disclosed the names of the persons involved to him. Upon information and belief, other council members among the group of four already knew who was involved before the letter was sent.

107. At the time that Ms. Rehberg's March 13, 2023 letter was emailed to the City Council members, Dr. Holsey-Hyman was presiding over a leadership forum for over 90 students at North Carolina Central University. She received a call from Mayor O'Neal for her to check her email. Dr. Holsey-Hyman read the Rehberg letter. She understood the campaign staffer issue was likely related to her, but she had no idea who the alleged "extortion" issue was concerning. Mayor O'Neal told Dr. Holsey-Hyman that Defendant Middleton had just called her and told her that the Council member the letter was concerning was Dr. Holsey-Hyman, that he ("Mr. Middleton") wanted Dr. Holsey-Hyman to resign, and that if Dr. Holsey-Hyman resigned, this would all go away.

108. The fact that Mr. Middleton contacted Mayor O'Neal demanding Dr. Holsey-Hyman's resignation within minutes after Ms. Rehberg's letter was emailed to the Council members indicates Mr. Middleton had his plan of action already in place prior to the letter being sent.

109. The fact that Mr. Middleton told Mayor O'Neal that if Dr. Holsey-Hyman resigned, it would all "go away," indicated Mr. Middleton had some sort of control over Mr. Edens' actions going forward and that Mr. Middleton had probably spoken directly to Mr. Edens about the matter.

25

To what extent Mr. Middleton and Mr. Edens discussed this matter, and/or potentially planned this matter, is yet to be determined.

110. Mr. Middleton wanted Dr. Holsey-Hyman off of the Council. He was upset with her for having voted no for the Carpenter Falls Annexation and on other development matters, and he now realized she was going to be a fairly consistent "no" vote on future development matters coming before the Council. He saw this as an easy way to embarrass her for her "no" vote and to silence her voice.

111. Without ever speaking to Dr. Holsey-Hyman about the matter, and without ever confirming what was said or not said between her and Mr. Edens, he stated to the Mayor that she needed to resign.

112. When Mayor O'Neal told Dr. Holsey-Hyman that the extortion allegation was concerning her, she was in shock. Dr. Holsey-Hyman knew she had done nothing wrong. She did not understand how such damning false allegations could be made against her. She continued trying to preside over her leadership forum for the rest of the afternoon. She was unable to control her emotions. Colleagues saw her upset and crying.

C. Defendant Rehberg's March 14, 2023 Memo.

113. Apparently in response to some of the Council members' concerns over the fact that Ms. Rehberg had sent the March 13, 2023 letter, the next day, on March 14, 2023, Ms. Rehberg sent an email memorandum to all of the City Council members and to the City Manager, Wanda Page. A true and accurate copy of this memo is attached hereto as Exhibit B. As with her letter, Ms. Rehberg knew this memorandum would be a matter of public record and would immediately be available to the public and to the media.

26

114.    In her March 14, 2023 memo, Ms. Rehberg made more false and defamatory statements and implications about Dr. Holsey-Hyman.  In the only portion of the memo that she placed in bold print, Ms. Rehberg stated:

> **The City Council should be concerned about the threats to the integrity of its work and to public confidence posed by allegations of corruption.  It is unlikely that a developer would report conduct that has no factual basis or to maliciously cause harm, particularly a developer who regularly brings matters before the City.**

115.    For Ms. Rehberg to state her opinion that "it is unlikely that a developer would report conduct that has no factual basis or to maliciously cause harm" was intended to imply, and did in fact imply, that Dr. Holsey-Hyman was in fact guilty of corruption, more specifically, extortion.  Ms. Rehberg included this scurrilous accusation despite knowing that it would be preposterous for someone with Dr. Holsey-Hyman's esteemed background and lengthy career in education and social work to risk her entire career and risk going to jail over a property development to which she had no personal connection.

116.    Further, for Ms. Rehberg to include this "opinion," and omit the converse, that it was just as if not more unlikely that Dr. Holsey-Hyman had committed extortion, was also defamatory.  Such an omission was intended by Ms. Rehberg to bolster her false and defamatory implication that Dr. Holsey-Hyman was in fact guilty.

117.    Ms. Rehberg also failed to include in her letter or memo the fact that Mr. Edens was going to lose money for every day that the Carpenter Falls Annexation did not pass, again, ensuring the readers would believe Mr. Edens was telling the truth and that Dr. Holsey-Hyman was guilty.

118.    Oddly, in her March 14, 2023 memo, Ms. Rehberg then starts talking about the process the City Council members need to go through in order to determine who the alleged

extorter is. This is at a minimum disingenuous in that she knew who it was, she knew that Mr. Middleton knew who it was, she that Mayor O'Neal knew who it was, and she had to have assumed the other Council members knew as well.

119. She also, shockingly for the first time, mentions that someone might want to reach out to the developer. For Ms. Rehberg to have made so many defamatory accusations and implications up to this point without ever speaking to Mr. Edens, or have someone else speak to Mr. Edens, exhibited an extraordinarily reckless disregard for the truth of her statements and implications, and an extraordinarily reckless disregard for the health, career, and well-being of Dr. Holsey-Hyman.

D. Defendant Rehberg Advises the Council Should "Act Quickly" and that Dr. Holsey-Hyman Should Recuse Herself Before the Next Meeting.

120. Ms. Rehberg then made the statement: "any Councilmember confirming that they are implicated by the developer's allegations could, in the interests of protecting the integrity of the City, request an excused absence for the meeting on Monday, March 20th."

121. So, Ms. Rehberg has conveniently given her expert attorney opinion that the accused should recuse herself from future Council meetings.

122. Over the following days, Ms. Rehberg continued to stress to Mayor O'Neal that the Council needed to act quickly, that the Council should do their own investigation and take action before the next meeting, and that Dr. Holsey-Hyman should at a minimum recuse herself.

123. At this point, Mayor Pro Tem Middleton was demanding that Dr. Holsey-Hyman resign, and the City Attorney Rehberg was advising the Mayor that the Council should do their own investigation and "act quickly", and City Attorney Rehberg was advising Dr. Holsey-Hyman that she should recuse herself from future Council meetings—all in an effort to punish and embarrass Dr. Holsey-Hyman for her "no" vote on the Carpenter Falls Annexation, to keep her

28

from being able to vote "no" on future development projects that come before the Council, and for other personal and vindictive reasons.

**V.** **Defendants Johnson and Middleton Publish a False and Defamatory Resolution of Censure and Make Other False and Defamatory Statements and Implications with a Complete Disregard as to the Truth of the Statements, Fueled by Frustration with Dr. Holsey-Hyman and an Effort to Retaliate.**

124.    It should be emphasized that around this time Mr. Edens was already speaking to Mr. Middleton, Ms. Young, and others in the City about when would be the next time he would be able to bring his Carpenter Falls project back up before the Council. A goal among all Defendants was to assist Mr. Edens in getting his Carpenter Falls Annexation passed as soon as possible.

125.    Upon information and belief, Mayor O'Neal received subsequent calls and/or emails from Mr. Middleton and others from the group of four requesting that the Mayor ask Dr. Holsey-Hyman for her resignation and to "bring her before the Council."

126.    Council member Freeman requested that the Mayor use restraint because she felt that Mr. Middleton, Ms. Rehberg, and Ms. Johnson wanted to "crucify" Dr. Holsey-Hyman "without justice."

127.    Mayor O'Neal consulted with the UNC School of Government. Options were provided, one of which was to turn the case over to the State Bureau of Investigation ("SBI"). On or about March 16, 2023, the group of four, Middleton, Johnson, Caballero, and Williams, voted (in private sessions) to submit the case to the SBI, and the matter was then submitted to the SBI for investigation.

128.    Dr. Holsey-Hyman met with Mayor O'Neal and City Attorney Rehberg, on the same day, March 16. During the meeting, Ms. Rehberg was visibly upset at Dr. Holsey-Hyman as if it was a foregone conclusion that Dr. Holsey-Hyman was guilty. Ms. Rehberg expressed

concern that because of Dr. Holsey-Hyman's actions, everyone was going to be hurt. Dr. Holsey-Hyman adamantly denied the accusations. Dr. Holsey-Hyman reminded Ms. Rehberg how damaging these accusations were to her reputation and to her career. Ms. Rehberg continued to refuse to tell Dr. Holsey-Hyman the name of the developer who had made the accusations. Ms. Rehberg repeatedly told Dr. Holsey-Hyman that they had to keep his name "confidential."

129. Ms. Rehberg was ready and willing to publicly brandish Dr. Holsey-Hyman as guilty of a Class F felony, before any investigation had occurred, yet was not willing to disclose to Dr. Holsey-Hyman the name of her alleged accuser, because she needed to keep his name out of it.

130. It should be reemphasized that there was no requirement for Ms. Rehberg to write her March 13 letter or her March 14 memo or to express the opinions or make the statements and implications she made in her letter and memo. An investigation could have, and should have, been conducted first. However, the truth was of no concern to Ms. Rehberg or the other Defendants with regard to the end result they were seeking. They wanted to embarrass and humiliate Dr. Holsey-Hyman, and they wanted her off the Council.

131. Once the alleged extortion matter was referred to the SBI, the Defendants turned to other ways and means to defame, discredit, embarrass, and humiliate Dr. Holsey-Hyman.

132. To provide more background with regard to the City staffer matter briefly referenced above, on or about January 13, 2023, a city employee, Gerald Wallace, was granted permission by City HR to work on Dr. Holsey-Hyman's campaign. Mr. Wallace was provided a copy of the rules that stated in part he cannot perform campaign activities while on duty at work. On March 6, 2023, Mr. Wallace sent a flier via his personal Facebook Messenger from his personal cell phone to a friend, Lukas Rutledge, regarding Dr. Holsey-Hyman's campaign event scheduled

for the upcoming weekend, March 12, 2023. At the time he sent this message out, Mr. Wallace was at work and was not on a break. So, this was a violation of City policy.

133. Mr. Wallace was not asked by Dr. Holsey-Hyman to send this flier to Mr. Rutledge while he was on the job. In fact, Dr. Holsey-Hyman had no knowledge Mr. Wallace was planning on sending the flier to Mr. Rutledge.

134. Mr. Wallace was reprimanded for this on March 14, 2023. In the written reprimand, it is clear that Mr. Wallace knew what he did was a violation of City policy, and it is also apparent that he was acting on his own. There is no mention that Dr. Holsey-Hyman had requested that he send the flier out during his work time.

135. In Ms. Rehberg's March 13, 2023 letter, she referenced this matter, as well as the accusations of extortion. Ms. Rehberg stated in her letter, "My hope is that Councilmembers will appreciate the sensitive position of City employees and refrain from requesting that City staff engage in campaign related activities while working in an official role for the City . . ."

136. However, at the time this letter was written, there was no evidence that Dr. Holsey-Hyman had requested that Mr. Wallace send the subject message during work time. In fact, it was readily apparent that Mr. Wallace knew the policy and had acted on his own.

137. Ms. Rehberg's intended implication by including the above-referenced sentence in her letter was that Dr. Holsey-Hyman had in fact requested that Mr. Wallace send the subject message during work hours, which Ms. Rehberg knew was false and defamatory.

138. After the "extortion" matter was referred to the SBI, given that the Defendants now had to wait on the results of the SBI investigation before they could continue their attacks on Dr. Holsey-Hyman as related to that matter, the Defendants turned all of their attention to this matter involving the campaign volunteer sending a campaign related Facebook message to a friend during work hours.

139.     Within the following week, Defendants Council members Johnson and Middleton, and potentially others in the group of four, devised a plan to present a false and defamatory formal Resolution of Censure against Dr. Holsey-Hyman related to this city staffer issue.

140.     Ms. Johnson and Mr. Middleton's plan was for Ms. Johnson to present the Resolution of Censure at the March 23, 2023 public City Council meeting.

141.     Ms. Johnson reviewed and obtained approval from Council members Williams and Caballero for the Resolution of Censure.

142.     Council Rules of Procedure set out the standards for Censure: "A member of Council may be censured for **extreme or outrageous conduct in making a deliberate and intentional violation of these rules**. . . ." (Council Rules of Procedure, Rule 2.14).

143.     There was no possible way for anyone to argue that the campaign volunteer sending a message to a friend during work hours could be considered "extreme or outrageous conduct."

144.     Further, there was no evidence that Dr. Holsey-Hyman had requested the staffer to send the message during work time, or that she even knew he was sending the message at all.

145.     As admitted by Mr. Middleton during the March 23, 2023 City Council meeting, there had never been a censure of any city council member, for anything, for as long as he had been involved in the Council.  No other council member had been involved or voted for a censure prior to this. He stated the issue of censure had never even come up.

146.     Yet, these four council members voted to allow Ms. Johnson to present a false and defamatory Resolution of Censure over a campaign volunteer sending one campaign related Facebook message to a friend during work hours.

147.     Prior to the March 23, 2023 City Council meeting during which they planned to present their Resolution of Censure regarding the city staffer matter, it was discussed and known among the Defendants that Mayor O'Neal would be reading a statement about the "extortion

32

allegations" but that Dr. Holsey-Hyman's name was not going to be disclosed in the statement. It was unsatisfactory to Ms. Johnson and the other Defendants to allow Dr. Holsey-Hyman's name to remain confidential until the conclusion of the SBI investigation. They wanted her to be publicly embarrassed and humiliated, especially in the eyes of the media, as soon as possible.

148.    So, before the March 23, 2023 public meeting, Ms. Johnson leaked to the press that Dr. Holsey-Hyman was the council member that was the subject of the "extortion probe." The press now definitively knew that Dr. Holsey-Hyman was the subject of Ms. Rehberg's March 13, 2023 letter. There was no purpose for Ms. Johnson doing this other than to ensure that the press and media would be ready to pounce on Dr. Holsey-Hyman, regarding both the false Censure and the false "extortion" allegation, and to inflict as much embarrassment, ridicule, emotional distress, and humiliation as she could upon Dr. Holsey-Hyman.

149.    Upon information and belief, the fact that Ms. Johnson planned to leak Dr. Holsey-Hyman's name to the press was discussed between her and Mr. Middleton, and others.

150.    The "**Resolution of Censure of Council Member Monique Holsey-Hyman**" was presented to the City Council by Ms. Johnson during its March 23, 2023 meeting. It stated that on two separate occasions Dr. Holsey-Hyman had asked a city staffer to perform campaign-related work while on duty. This was not true. Ms. Johnson knew this was not true at the time that she drafted and presented the Resolution of Censure to the Council. A true and accurate copy of the Resolution of Censure of Council Member Monique Holsey-Hyman is attached hereto as Exhibit C.

151.    Prior to the March 23, 2023 meeting, Ms. Johnson circulated a draft of the Resolution of Censure to other Council members which included the signature of Mayor O'Neal. The mayor never signed the Resolution and did not approve of the Censure. Mayor O'Neal immediately requested that her name be removed from the Resolution of Censure.

33

152. After Ms. Johnson presented the Resolution of Censure, Dr. Holsey-Hyman made a statement succinctly denying any wrongdoing. She made it clear that she never asked the staff member to do any campaign activity during work hours.

153. After Dr. Holsey-Hyman's statement, Mayor Pro Tem Middleton then made a statement. Despite the fact that there was no evidence that Dr. Holsey-Hyman had asked the staff member to perform campaign related activity during work hours, and despite the fact that Dr. Holsey-Hyman had just clarified to everyone that she had not done so, Mr. Middleton repeatedly made statements inferring that she had. He made the comment that if a councilmember has to question whether what he/she is asking the staff member to do is campaign related, then the councilmember should refrain from asking the staff member to perform the task. This was inferring that Ms. Holsey-Hyman had in fact asked the subject staff member to perform the questioned activity during work hours, which she had not. This was a false and defamatory inference. Mr. Middleton knew this inference was false.

154. Mr. Middleton voiced strong support for the Resolution of Censure, despite never having voted on or considered a censure before, and despite being aware of the standard for censure being "extreme or outrageous conduct" as stated in the Rules referenced above.

155. In an effort to convince others to also vote for the censure, Mr. Middleton stated that a censure was comparable to a "slap on the wrist," "running a red light," or "a seat belt ticket."

156. Without any evidence that Dr. Holsey-Hyman had committed the questioned acts at all, Mr. Middleton stated that Dr. Holsey-Hyman had exhibited a "pattern of behavior." This was a false and defamatory statement and inference that Mr. Middleton knew was false at the time he made it.

157. Ms. Johnson then spoke and repeated many of the same statements and inferences that Mr. Middleton had made. She stated that there was a "pattern of behavior," which was false

34

and defamatory, and she made the statement that because the staff member was performing campaign work, then Dr. Holsey-Hyman had to have asked the staff member to do the work at some point, inferring that she was guilty. Ms. Johnson of course glossed over the glaring omission in this rationalization that Dr. Holsey-Hyman **never asked the staff member to send the subject message during work hours.** This had just been made very clear by Dr. Holsey-Hyman, and there was no other evidence that she had. The staff member had already provided a written statement explaining that he had done this on his own.

158. The Resolution of Censure that Ms. Johnson presented to the Council was false and defamatory. The statements that Mr. Middleton and Ms. Johnson made from the Dais on March 23, 2023 were false and defamatory.

159. The Resolution of Censure was never voted on but it was intentionally brought before the Council to defame, disparage, denigrate, humiliate, and embarrass Dr. Holsey-Hyman. It was never brought up again, leaving the Resolution pending and hanging over Dr. Holsey-Hyman's head.

160. At the conclusion of the May 23, 2023 Council meeting, Mayor O'Neal expressed on record shock and what could fairly be characterized as disgust over the way some of her fellow council members, including Johnson and Middleton, had treated Dr. Holsey-Hyman.

161. Fellow Council member DeDreana Freeman proclaimed to the Mayor that this was an unjustified and uncalled for rush to judgment, and that she "would not participate in a public lynching of a Black woman."

162. A heated argument took place between Defendant Middleton and Council member Freeman after the March 23, 2023 meeting during which Middleton commented something to the effect of, "I told you we shouldn't have voted her in," implying they should not have voted to appoint Dr. Holsey-Hyman to the Council.

35

163.    As a result of Ms. Johnson alerting the media that Dr. Holsey-Hyman was the "alleged extorter," the media covering the March 23, 2023 reported not only on the issues presented in the Resolution of Censure regarding alleged improper use of city staff, but also on the "alleged extortion" issue, squarely naming Dr. Holsey-Hyman as the target.

164.    All local and many state-wide newspapers, TV stations, and other outlets covered the story.

165.    It should be emphasized that the Resolution of Censure, and all of the defamatory comments made by Defendant Middleton and Defendant Johnson at the May 23, 2023 City Council Meeting were not properly before the Council.  The actions outlined in the Resolution of Censure did not come close to meeting the "extreme and outrageous conduct" standard for censure outlined in the Council Rules.

166.    Because the Resolution of Censure and all of Mr. Middleton and Ms. Johnson's comments regarding the Resolution of Censure at the March 23, 2023 City Council meeting were not material or pertinent to any issue properly before the Council, the Defendants are not afforded any privilege or immunity from liability for their defamatory and other wrongful actions taken on the Council Dais.

167.    Further, all of the other defamatory and wrongful actions taken by Defendants Young, Rehberg, Middleton, and Johnson referenced herein were taken with an intentional disregard for the falsity of the statements they were making and with an intentional and gross disregard for the rights, health, and wellbeing of Dr. Holsey-Hyman.  All of said Defendants' actions were taken in bad faith and with actual malice, accordingly, said Defendants are not afforded any potential qualified or conditional immunity or privilege from liability for their actions.

168. The Resolution of Censure, and the other defamatory actions taken by the Defendants from March 12 through March 23 were all intended to:

a. Disparage, embarrass, and humiliate Dr. Holsey-Hyman;

b. Punish and retaliate against Dr. Holsey-Hyman for her "no" vote on the Carpenter Falls Annexation;

c. Silence Dr. Hosley-Hyman's vote long enough to enable Mr. Edens and Edens Investments to quickly bring their Carpenter Falls Annexation back before the Council quickly and to ensure its passage;

d. To retaliate and punish Dr. Holsey-Hyman for not voting in support of Ms. Rehberg's request for a raise and/or promotion;

e. Ensure removal of Dr. Holsey-Hyman from the City Council either by resignation, withdrawal of her reelection efforts, or an election loss, so that she would be unable to vote "no" on development projects in the future; and

f. For other reasons to be determined through discovery and at trial.

169. Mr. Edens and Edens Investments' Carpenter Falls Annexation was brought back before the Council on May 12, 2023, which was much sooner than the normal process allows. Mayor O'Neal announced that Mr. Edens was the developer that had made the allegations against Dr. Holsey-Hyman. This was the first time that the public was made aware of the identity of Mr. Edens as the accuser. The vote on his project was delayed until May 15 for Council member Caballero to return from being out of town, at which time, his annexation passed. Mr. Edens and Edens Investments got what they wanted.

170. The SBI's investigation was completed on September 15, 2023 and concluded that Dr. Holsey-Hyman had committed no wrongdoing whatsoever regarding the alleged "extortion" matter, and it also determined that she had committed no wrongdoing whatsoever regarding the allegation that she had improperly solicited a City staffer to engage in campaign activities.

171. The SBI report stressed that Dr. Holsey-Hyman had been extremely cooperative during the investigation process; while, to the contrary, Mr. Edens was very uncooperative. The

37

report detailed that Mr. Edens was never willing to be interviewed about the matter, that he did not answer calls, that he did not return messages, that he agreed to meet for an interview but then did not appear, and that Mr. Edens' attorney represented he would be providing a written statement from Mr. Edens, but the written statement was never provided.

172.    After the one time the SBI Investigator was actually able to very briefly speak to Mr. Edens, the investigator stated in his report that, "Edens said that it [referring to whatever comments were made between him and Dr. Holsey-Hyman] was not really a big deal, and it almost made him giggle."

173.    The SBI presented its report to Satana Deberry, the District Attorney for the 16th Prosecutorial District, who summarized the findings of the report in a letter to the City dated September 19, 2023. A true and accurate copy of this September 19, 2023 letter is attached hereto as Exhibit D.

174.    The false allegations of extortion and false allegations of other wrongdoing referenced herein continue to be spread throughout social media. Everytime someone searches Dr. Holsey-Hyman online, these false allegations are the first stories to pop-up. These false allegations will follow and be with Dr. Holsey-Hyman for the rest of her life.

175.    Additional defamatory publications will be revealed through discovery and established at trial.

**VI.    Damages.**

176.    Dr. Holsey-Hyman has suffered severe emotional distress, embarrassment, injury to moral character, and injury to reputation as a result of Defendants' libel, slander, retaliation, and other wrongful actions.

177.    Dr. Holsey-Hyman has suffered sleeplessness. She suffered panic attacks. She has suffered from headaches and migraines. She suffered uncontrolled crying. She had trouble

38

performing her responsibilities as a professor at N.C. Central University. She had trouble performing her duties as a City Councilmember. She suffered increased anxiety just walking into the City Council building.

178.    Dr. Holsey-Hyman was the subject of repeated and constant disparaging and humiliating social media posts and comments repeating the false allegations.

179.    Dr. Holsey-Hyman was passed over for awards and other accommodations for which she otherwise would have been considered but for Defendants' wrongful actions.

180.    Dr. Holsey-Hyman has lost publication contracts and promotions as a result of Defendants' wrongful actions.

181.    Dr. Holsey-Hyman decided to continue with her reelection campaign; however, the majority of the time that she was campaigning, the SBI investigation was still pending. She was unable to secure several key endorsements primarily due to the fact that she was under investigation for extortion. When she reached out for support from the Realtor Association, their response was, "why don't you admit you're guilty."

182.    She was unable to raise as much money as she otherwise would have but for the Defendants' wrongful accusations and other wrongful actions. Dr. Holsey-Hyman lost her bid for reelection. The Defendants achieved their primary objective, to ensure Dr. Holsey-Hyman was punished and removed.

183.    Dr. Holsey-Hyman has sought professional mental health treatment and has been diagnosed with acute stress disorder and post-traumatic stress disorder.

184.    Dr. Holsey-Hyman is entitled to an award of all damages presumed by law to have been suffered by such defamatory actions in an amount to be determined by the trier of fact. Dr. Holsey-Hyman has suffered other actual damages, including monetary damages, as a result of Defendants' libel, slander, and other wrongful actions, including but not limited to loss of income.

39

185. As Defendants' actions were committed intentionally, with a reckless disregard for Dr. Holsey-Hyman's rights, and with actual malice, and with common law malice, all as more specifically set forth in paragraphs 25 through 175, above, Dr. Holsey-Hyman is entitled to an award of punitive damages as allowed by law to deter Defendants from committing this type of conduct again in the future.

## FIRST CLAIM FOR RELIEF
### (Slander *Per Se* Against Jarrod Edens and Edens Investments, Inc.)

186. Plaintiff realleges and incorporates by reference paragraphs 1 through 185 of this Complaint as if fully set forth herein.

187. On or about March 11, 2023, Defendant Jarrod Edens uttered, and caused to be uttered words to Defendant Sara Young and to potentially others, as referenced above, that were false and defamatory.

188. At the time the aforedescribed defamatory statements were uttered, Mr. Edens was working for and on behalf of his company Edens Investments. Edens Investments stood to gain from Mr. Edens' defamatory statements if they were to be successful in silencing Dr. Holsey-Hyman's voice and ensuring passage of the Carpenter Falls Annexation, which they were eventually able to do.

189. At all times alleged herein, Mr. Edens was the owner, organizer, manager, and operator of Edens Investments. He was acting as an agent for, and on behalf of, Edens Investments. All persons/entities who cause or participate in the publication of libelous matter are deemed responsible, jointly and severally, for such publication. So, both Mr. Edens and Edens Investments are jointly and severally responsible for Mr. Edens' defamatory statements referenced herein.

40

190. The statements uttered by Mr. Edens on or about March 11, 2023 as referenced herein, falsely accused Dr. Holsey-Hyman of crimes and also impeached Dr. Holsey-Hyman in her trade and profession.

191. At the time the statements were uttered, Defendant Edens and Edens Investments either knew the statements were false or failed to exercise ordinary care in order to determine whether the statements were false.

192. Further, at the time the statements were uttered, Defendant Edens and Edens Investments either knew the statements were false or acted with reckless disregard as to whether the statements were false. As such, Defendants Edens and Edens Investments uttered the statements with actual malice.

193. The false, defamatory statements made by Defendants Edens and Edens Investments on or about March 11, 2023 as referenced herein were of and concerning Dr. Holsey-Hyman.

194. The words uttered by Defendants Edens and Edens Investments on or about March 11, 2023 as referenced herein defamed and slandered Dr. Holsey-Hyman.

195. Defendants Edens and Edens Investments made other defamatory statements to be established through discovery and at trial.

196. Dr. Holsey-Hyman has suffered presumed and actual damages, including but not limited to actual monetary damages in the form of medical and other healthcare expenses, lost earnings and lost revenue, all in excess of Twenty-Five Thousand Dollars ($25,000.00), proximately caused by Defendants Edens and Edens Investments, as a result of their defamation of Dr. Holsey-Hyman.

197. Dr. Holsey-Hyman is entitled to punitive damages as more specifically set forth above as allowed by law.

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 41 of 68

## SECOND CLAIM FOR RELIEF
### (Slander *Per Se* Against Sara Young)

198.    Plaintiff realleges and incorporates by reference paragraphs 1 through 197 of this Complaint as if fully set forth herein.

199.    On or about March 11, 12, and 13, 2023, Defendant Sara Young uttered, and caused to be uttered words to Defendant Kim Rehberg and to potentially others, as referenced above, that were false and defamatory.

200.    The statements uttered by Ms. Young on or about March 11, 12, and 13, 2023 as referenced herein falsely accused Dr. Holsey-Hyman of crimes and also impeached Dr. Holsey-Hyman in her trade and profession.

201.    At the time the statements were uttered, Defendant Young either knew the statements were false or failed to exercise ordinary care in order to determine whether the statements were false.

202.    Further, at the time the statements were uttered, Defendant Young knew the statements were false or acted with reckless disregard as to whether the statements were false. As such, Defendant Young uttered the statements with actual malice.

203.    The false, defamatory statements made by Defendant Young on or about March 11, 12, and 13, 2023 as referenced herein were of and concerning Dr. Holsey-Hyman.

204.    The words uttered by Defendant Young on or about March 11, 12, and 13, 2023 as referenced herein defamed and slandered Dr. Holsey-Hyman.

205.    Defendant Young made other defamatory statements to be established through discovery and at trial.

206.    Dr. Holsey-Hyman has suffered presumed and actual damages, including but not limited to actual monetary damages in the form of medical and other healthcare expenses, lost

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 42 of 68

earnings and lost revenue, in excess of Twenty-Five Thousand Dollars ($25,000.00), proximately caused by Defendant Young, as a result of her defamation of Dr. Holsey-Hyman.

207. Dr. Holsey-Hyman is entitled to punitive damages as more specifically set forth above as allowed by law.

### THIRD CLAIM FOR RELIEF
#### (Libel *Per Se* Against Kimberly Rehberg and the City of Durham)

208. Plaintiff realleges and incorporates by reference paragraphs 1 through 207 of this Complaint as if fully set forth herein.

209. Defendant Rehberg wrote, printed, caused to print, and possessed in printed form her March 13, 2023 letter and her March 14, 2023 memo referenced herein.

210. Defendant Rehberg published her March 13, 2023 letter and her March 14, 2023 memo to the City Council and to others. She also knew that both the letter and memo were public record and would immediately be available to the public and to the media. She knew they would be, and intended for them to be, published to the public, which they were.

211. Statements and implications made in Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, were false.

212. Statements and implications made in Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, were defamatory.

213. Statements and implications made in Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, falsely accused Dr. Holsey-Hyman of crimes and impeached Dr. Holsey-Hyman in her trade and profession.

214. At the time of the publication of Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, Defendant Rehberg either knew the statements

43

and implications made in said publications were false or failed to exercise ordinary care in order to determine whether the statements and implications were false.

215. Additionally, at the time of the publication of Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, Defendant Rehberg either knew that the statements and implications made in said publications were false or acted with reckless disregard of whether the statements and implications were false. As such, Defendant Rehberg published the statements and implications with actual malice.

216. The false, defamatory statements and implications contained in Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, were of and concerning Dr. Holsey-Hyman.

217. The words published by Defendant Rehberg by means of her March 13, 2023 letter and her March 14, 2023 memo, as described herein, defamed and libeled Dr. Holsey-Hyman.

218. At the time the aforedescribed defamatory statements and implications were published, Defendant Rehberg was working for and on behalf of the City of Durham. As was stated in writing by Defendant Rehberg, City Manager Wanda Page was aware of and condoned the statements and implications made by Defendant Rehberg referenced herein. Defendant Rehberg and City Manager Page knew that by sending the defamatory letter and memo referenced herein to the City Councilmembers, they were publishing the letter and memo to the public. The City of Durham was aware of and condoned the defamatory statements and implications uttered by Defendant Rehberg.

219. All persons/entities who cause or participate in the publication of libelous matter are deemed responsible, jointly and severally, for such publication. So, both Defendant Rehberg individually and the City of Durham are jointly and severally responsible for Defendant Rehberg's defamatory statements and implications referenced herein.

220.    Dr. Holsey-Hyman has suffered presumed and actual damages, including but not limited to actual monetary damages in the form of medical and other healthcare expenses, lost earnings and lost revenue, in excess of Twenty-Five Thousand Dollars ($25,000.00), proximately caused by Defendant Rehberg and the City of Durham, as a result of their defamation of Dr. Holsey-Hyman.

221.    Dr. Holsey-Hyman is entitled to punitive damages as more specifically set forth above as allowed by law.

**FOURTH CLAIM FOR RELIEF**
**(Libel *Per Quod* Against Kimberly Rehberg and the**
**City of Durham-In the Alternative)**

222.    Plaintiff realleges and incorporates by reference paragraphs 1 through 221 of this Complaint as if fully set forth herein.

223.    While Plaintiff asserts the March 13, 2023 letter and the March 14, 2023 memo are libel *per se*, to the extent any part of said publications are deemed libel *per quod*, Plaintiff states as follows.

224.    Defendant Rehberg wrote, printed, caused to print, and possessed in printed form her March 13, 2023 letter and her March 14, 2023 memo referenced herein.

225.    Defendant Rehberg published her March 13, 2023 letter and her March 14, 2023 memo to the City Council and to others.  She also knew that both the letter and memo were public record and would be immediately available to the public and to the media. She knew they were going to be published to the public, which they were.

226.    Statements and implications made in Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, were false.

227.    Statements and implications made in Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, were defamatory.

45

228. Statements and implications made in Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, falsely accused Dr. Holsey-Hyman of crimes and impeached Dr. Holsey-Hyman in her trade and profession.

229. At the time of the publication of Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, Defendant Rehberg either knew the statements and implications made in said publications were false or failed to exercise ordinary care in order to determine whether the statements and implications were false.

230. Additionally, at the time of the publication of Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, Defendant Rehberg either knew that the statements and implications made in said publications were false or acted with reckless disregard of whether the statements and implications were false. As such, Defendant Rehberg published the statements and implications with actual malice.

231. The false, defamatory statements and implications contained in Defendant Rehberg's March 13, 2023 letter and her March 14, 2023 memo, as described herein, were of and concerning Dr. Holsey-Hyman.

232. The words published by Defendant Rehberg by means of her March 13, 2023 letter and her March 14, 2023 memo, as described herein, defamed and libeled Dr. Holsey-Hyman.

233. The false statements are defamatory when considered in connection with innuendo, colloquium, and the circumstances in which they were made, thus constituting libel *per quod.*

234. At the time the aforedescribed defamatory statements and implications were published, Defendant Rehberg was working for and on behalf of the City of Durham. As was stated in writing by Defendant Rehberg, City Manager Wanda Page was aware of and condoned the statements and implications made by Defendant Rehberg referenced herein. Defendant Rehberg and City Manager Page knew that by sending the defamatory letter and memo referenced

herein to the City Councilmembers, they were publishing the letter and memo to the public. The City of Durham was aware of and condoned the defamatory statements and implications uttered by Defendant Rehberg.

235. All persons/entities who cause or participate in the publication of libelous matter are deemed responsible, jointly and severally, for such publication. So, both Defendant Rehberg individually and the City of Durham are jointly and severally responsible for Defendant Rehberg's defamatory statements and implications referenced herein.

236. Defendant Rehberg made other defamatory publications to be established through discovery and at trial.

237. Dr. Holsey-Hyman has suffered presumed and actual damages, including but not limited to actual monetary damages in the form of medical and other healthcare expenses, lost earnings and lost revenue, in excess of Twenty-Five Thousand Dollars ($25,000.00), proximately caused by Defendant Rehberg and the City of Durham, as a result of their defamation of Dr. Holsey-Hyman.

238. Dr. Holsey-Hyman is entitled to punitive damages as more specifically set forth above as allowed by law.

## FIFTH CLAIM FOR RELIEF
### (Libel *Per Se* Against Jillian Johnson, Mark Middleton, and the City of Durham)

239. Plaintiff realleges and incorporates by reference paragraphs 1 through 238 of this Complaint as if fully set forth herein.

240. While Defendant Johnson presented the Resolution of Censure to the City Council, Defendant Middleton participated in the drafting, preparation, and publication of the Resolution of Censure. Accordingly, both Defendants Johnson and Middleton wrote, printed, caused to print, and possessed in printed form the Resolution of Censure referenced herein.

47

241. Defendants Johnson and Middleton published the Resolution of Censure to the City Council, to the public, and to others.

242. Statements and implications made by Defendants Johnson and Middleton in the Resolution of Censure, as described herein, were false.

243. Statements and implications made by Defendants Johnson and Middleton in the Resolution of Censure, as described herein, were defamatory.

244. Statements and implications made by Defendants Johnson and Middleton in the Resolution of Censure, as described herein, falsely accused Dr. Holsey-Hyman of crimes and impeached Dr. Holsey-Hyman in her trade and profession.

245. At the time of the publication of the Resolution of Censure, as described herein, Defendants Johnson and Middleton either knew the statements and implications made in said publication were false or failed to exercise ordinary care in order to determine whether the statements and implications were false.

246. Additionally, at the time of the publication of the Resolution of Censure, as described herein, Defendants Johnson and Middleton either knew that the statements and implications made in said publication were false or acted with reckless disregard of whether the statements and implications were false. As such, Defendants Johnson and Middleton published the statements and implications with actual malice.

247. The false, defamatory statements and implications contained in the Resolution of Censure, as described herein, were of and concerning Dr. Holsey-Hyman.

248. The words published by Defendants Johnson and Middleton in the Resolution of Censure, as described herein, defamed and libeled Dr. Holsey-Hyman.

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 48 of 68

249. In the alternative - the false statements are defamatory when considered in connection with innuendo, colloquium, and the circumstances in which they were made, thus constituting libel *per quod.*

250. At the time the aforedescribed defamatory statements and implications were published, Defendants Johnson and Middleton were elected City Councilmembers for the City of Durham. They are the managers, policymakers, and highest elected officials for the City. Their actions are one and the same as the actions of the City. Accordingly, the City of Durham is deemed to have participated in and condoned the defamatory statements and implications published by Defendants Johnson and Middleton.

251. All persons/entities who cause or participate in the publication of libelous matter are deemed responsible, jointly and severally, for such publication. So, Defendants Johnson, Middleton, and the City of Durham are jointly and severally responsible for Defendants Johnson and Middleton's defamatory statements and implications referenced herein.

252. The Resolution of Censure was not pertinent or material to any City matters or issues properly before the Council, and it was presented and published in bad faith and with actual malice. Accordingly, no purported privilege or immunity from liability applies.

253. Dr. Holsey-Hyman has suffered presumed and actual damages, including but not limited to actual monetary damages in the form of medical and other healthcare expenses, lost earnings and lost revenue, in excess of Twenty-Five Thousand Dollars ($25,000.00), proximately caused by Defendants Johnson, Middleton, and the City of Durham, as a result of their defamation of Dr. Holsey-Hyman.

254. Dr. Holsey-Hyman is entitled to punitive damages as more specifically set forth above as allowed by law.

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 49 of 68

## SIXTH CLAIM FOR RELIEF
### (Slander *Per Se* Against Jillian Johnson, Mark Middleton, and the City of Durham)

255.   Plaintiff realleges and incorporates by reference paragraphs 1 through 254 of this Complaint as if fully set forth herein.

256.   At the March 23, 2023 Durham City Council meeting, Defendants Johnson and Middleton uttered, and caused to be uttered words to the public, as referenced above, that were false and defamatory.

257.   The statements and implications uttered by Defendants Johnson and Middleton on or about March 23 2023 as referenced herein, falsely accused Dr. Holsey-Hyman of crimes and also impeached Dr. Holsey-Hyman in her trade and profession.

258.   At the time the statements and implications were uttered, Defendants Johnson and Middleton either knew the statements were false or failed to exercise ordinary care in order to determine whether the statements and implications were false.

259.   Further, at the time the statements and implications were uttered, Defendants Johnson and Middleton knew the statements were false or acted with reckless disregard as to whether the statements were false.  As such, Defendants Johnson and Middleton uttered the statements and implications with actual malice.

260.   The false, defamatory statements and implications made by Defendants Johnson and Middleton on or about March 23, 2023 as referenced herein were of and concerning Dr. Holsey-Hyman.

261.   The words uttered by Defendants Johnson and Middleton on or about March 23, 2023 as referenced herein defamed and slandered Dr. Holsey-Hyman.

262. In the alternative - the false statements are defamatory when considered in connection with innuendo, colloquium, and the circumstances in which they were made, thus constituting slander *per quod*.

263. At the time the aforedescribed defamatory statements and implications were uttered, Defendants Johnson and Middleton were elected City Councilmembers for the City of Durham. They are the managers, policymakers, and highest elected officials for the City. Their actions are one and the same as the actions of the City. Accordingly, the City of Durham is deemed to have participated in and condoned the defamatory statements and implications uttered by Defendants Johnson and Middleton.

264. All persons/entities who cause or participate in the publication of slanderous matter are deemed responsible, jointly and severally, for such publication. So, Defendants Johnson, Middleton, and the City of Durham are jointly and severally responsible for Defendant Johnson and Middleton's defamatory statements and implications referenced herein.

265. The statements and implications made by Defendants Johnson and Middleton at the City Council meeting on March 23, 2023 were not pertinent or material to any City matters or issues properly before the Council, and the statements and implications were made in bad faith and with actual malice. Accordingly, no purported privilege or immunity from liability applies.

266. Defendants Johnson and Middleton made other defamatory statements to be established through discovery and at trial.

267. Dr. Holsey-Hyman has suffered presumed and actual damages, including but not limited to actual monetary damages in the form of medical and other healthcare expenses, lost earnings and lost revenue, in excess of Twenty-Five Thousand Dollars ($25,000.00), proximately caused by Defendants Johnson, Middleton, and the City of Durham, as a result of their defamation of Dr. Holsey-Hyman.

268.     Dr. Holsey-Hyman is entitled to punitive damages as more specifically set forth above as allowed by law.

**SEVENTH CLAIM FOR RELIEF**

**(Claim Against Defendants Young, Rehberg, Johnson, Middleton, and the City of Durham for Retaliatory Actions in Violation of Dr. Holsey-Hyman's Right to Free Speech Established by the First Amendment to the United States Constitution, Pursuant to 42 U.S.C. § 1983)**

269.     Plaintiff realleges and incorporates by reference paragraphs 1 through 268 of this Complaint as if fully set forth herein.

270.     The First Amendment to the United States Constitution establishes and provides an elected or duly appointed representative the right to speak or vote freely on questions of government policy without fear of retribution or retaliation.

271.     When the Carpenter Falls Annexation came before the Durham City Council, Dr. Holsey-Hyman, as a duly appointed member of the City Council, had a First Amendment right to vote on the Annexation as she chose. She voted "no" on the Annexation.

272.     Dr. Holsey-Hyman's vote of "no" was free speech protected by The First Amendment.

273.     Defendants Young, Rehberg, Johnson, and Middleton were entitled to speak in response or in opposition to Dr. Holsey-Hyman's "no" vote, but not with intentional false and defamatory accusations, statements, and implications. There is no Constitutional right to or protection for false and defamatory speech.

274.     Defendants Young, Rehberg, Johnson, and Middleton made false and defamatory statements and implications about Dr. Holsey-Hyman, as described herein, that they knew were false, or were made with a reckless disregard as to the truth of the statements and implications, with the express purpose of punishing and retaliating against Dr. Holsey-Hyman for her "no" vote,

52

and with the express purpose of silencing Dr. Holsey-Hyman by forcing her to either resign, recuse herself from future meetings, and/or withdraw her bid for reelection.

275.    At a minimum, the aforesaid Defendants knew that after they made sure the false and defamatory accusations of extortion were widely known throughout the public, and they voted to have both the extortion matter and the campaign staffer matter referred to the SBI, Dr. Holsey-Hyman would be under the cloud of a state investigation for much of the remainder of the campaign, and they knew that she would not be able to win reelection with such an investigation hanging over her head.

276.    The aforesaid Defendants in fact achieved their intended purpose for their defamatory, retaliatory, and wrongful actions – Dr. Holsey-Hyman lost her reelection bid and has not been on the City Council since.

277.    Said Defendants' defamatory, retaliatory, and other wrongful actions, including the presentation of the false and defamatory Resolution of Censure, constituted adverse actions by the aforesaid Defendants and by the City of Durham and its agents that would not have been taken absent the retaliatory motive.

278.    Said Defendants' retaliatory actions, as described herein, resulted in Dr. Holsey-Hyman losing her bid for reelection, in addition to the other damages set forth herein. As a result, her vote was silenced.

279.    City Manager Wanda Page and Council member Defendants Johnson and Middleton explicitly approved of Defendant Rehberg's retaliatory and unconstitutional actions set forth herein. Councilmember Defendants Johnson and Middleton were the highest policymakers for the City. As such, their retaliatory and unconstitutional actions set forth herein were actions in fact taken "by the City."

53

280. Based on the principles set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978); and *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), the City of Durham is liable for the aforesaid Defendants' deprivation of Dr. Holsey-Hyman's constitutionally protected First Amendment rights and all of the other damages suffered by Dr. Holsey-Hyman as set forth herein.

281. Further, Defendant City of Durham, by and through its officials, managers, and policymakers, condoned, acquiesced, ratified, supported, and otherwise deliberately failed to correct or put a stop to known wrongful and unconstitutional actions being taken against Dr. Holsey-Hyman.

282. The City of Durham further violated Dr. Holsey-Hyman's constitutional rights in other ways to be established through discovery and at trial.

283. Upon information and belief, the aforementioned acts of Defendants were part of a pattern of unconstitutional conduct that exhibited at least deliberate indifference to and/or reckless disregard of the constitutional rights of Dr. Holsey-Hyman.

284. Defendant City of Durham is liable to Dr. Holsey-Hyman for her damages under 42. U.S.C. § 1983.

285. As a direct and proximate result of the Defendants Young, Rehberg, Johnson, Middleton, and the City of Durham's constitutional violations and deprivations as set forth herein, Dr. Holsey-Hyman has suffered general and special damages, including those listed in paragraphs 176 through 185 above, in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00). These damages were reasonably foreseeable by Defendants.

286. Dr. Holsey-Hyman is entitled to punitive damages as more specifically set forth above as allowed by law.

## EIGHTH CLAIM FOR RELIEF
### (Civil Conspiracy Against All Defendants)

287.    Plaintiff realleges and incorporates by reference paragraphs 1 through 286 of this Complaint as if fully set forth herein.

288.    Upon information and belief, Defendants joined together in an agreement to commit unlawful acts, or do lawful acts in an unlawful way.

289.    In pursuit of their civil conspiracy, the above-named conspirators conspired to unfairly and wrongfully defame and disparage Dr. Holsey-Hyman, retaliate against her for her vote on the Carpenter Falls Annexation, silence her voice on future development matters to come before the Council, and in the other ways as specifically set forth and described herein.  The conspirators committed other unlawful and wrongful actions in pursuit of their conspiracy as may further be revealed through discovery and at trial.

290.    The conspirators conspired to commit these acts secretly, without Dr. Holsey-Hyman's knowledge, and they concealed their plans and actions from Dr. Holsey-Hyman.

291.    The conspirators knew their actions were wrongful and were violating Dr. Holsey-Hyman's rights.

292.    The actions of Defendants were malicious, willful and wanton.  Dr. Holsey-Hyman has been damaged by Defendants' unlawful actions in furtherance of said conspiracy, and Dr. Holsey-Hyman is entitled to recover damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00), together with interest as allowed by law.

## NINTH CLAIM FOR RELIEF
### (Intentional/Negligent Infliction of Mental and Emotional Distress – Against All Defendants)

293.    Plaintiff refers to and incorporates herein by reference paragraphs 1 through 292 of this Complaint as if fully set forth herein.

55

294. The defamatory, retaliatory, and wrongful actions of Defendants, as herein described specifically in paragraphs 25 through 175, and in other ways to be established through discovery and at trial, constitute extreme and outrageous conduct. Defendants' actions were beyond the bounds usually tolerated by a decent society and were intended to cause severe emotional and mental distress to Dr. Holsey-Hyman.

295. Defendants exhibited a reckless indifference to the health and wellbeing of Dr. Holsey-Hyman and to the likelihood that their conduct would cause severe emotional and mental distress to Dr. Holsey-Hyman.

296. In the alternative to the claim for intentional infliction of emotional distress, Defendants owed a duty of care to the public (including Dr. Holsey-Hyman), the City, and their offices. Defendants breached their duties of care, and therefore negligently caused emotional distress, in the ways previously set forth herein.

297. The extreme and reckless actions of Defendants in fact did cause severe emotional and mental distress to Plaintiff. Dr. Holsey-Hyman has also been humiliated and embarrassed by Defendants' actions. As a result of Defendants' actions, Dr. Holsey-Hyman has sought counseling and treatment from mental health professionals, received mental health illness diagnoses, and been prescribed various mental health medications.

298. As a direct and proximate result of Defendants' intentional and/or negligent infliction of mental and emotional distress, Dr. Holsey-Hyman has been damaged generally and specially in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00). These damages were reasonably foreseeable and were proximately caused by Defendants' actions.

56

## TENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Kimberly Rehberg)

299.   Plaintiff refers to and incorporates herein by reference paragraphs 1 through 298 of this Complaint as if fully set forth herein.

300.   As the City Attorney, Defendant Rehberg provides legal advice and counsel to the Mayor, the City Council, and to other City staff, boards, and commissions of the City.  The City Attorney serves at the pleasure of, and reports directly to, the Mayor and the Council.

301.   At all times alleged herein, Defendant Rehberg, as the City Attorney for the City of Durham, owed a fiduciary toward the City Council and to Dr. Holsey-Hyman, including but not limited to the duty to act toward the Council with fidelity, loyalty, care, and good faith.

302.   At all relevant times alleged herein, Dr. Holsey-Hyman reposed trust and confidence in Defendant Rehberg to always act in good faith and in the best interests of the Council.

303.   Defendant Rehberg breached her fiduciary duty to Dr. Holsey-Hyman and to the Council by her defamatory, retaliatory, and other wrongful actions as set forth in paragraphs 25 through 175 above, and in other ways as may be further established in discovery and at trial.

304.   As a direct and proximate result of Defendant Rehberg's breaches of her fiduciary duty, Dr. Holsey-Hyman has been damaged in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).  These damages were reasonably foreseeable and were proximately caused by Defendant Rehberg's breaches of her fiduciary duty.

## ELEVENTH CLAIM FOR RELIEF
### (Punitive Damages as Against All Defendants)

305.   Plaintiff refers to and incorporates herein by reference paragraphs 1 through 304 of this Complaint as if fully set forth herein.

306.    Defendants knew, or should have known, that their defamatory statements and implications, as referenced herein, were false and defamatory, and that the publication of said defamatory statements and implications would inflict serious harm, injury, and damage upon Dr. Holsey-Hyman.

307.    Defendants knew, or should have known, that their retaliatory and other wrongful actions described herein would inflict serious harm, injury, and damage upon Dr. Holsey-Hyman.

308.    Defendants' actions as described herein demonstrate a conscious and intentional disregard of and indifference to the rights and safety of Dr. Holsey-Hyman, which Defendants knew or reasonably should have known was reasonably likely to result in injury, damage, or harm to Dr. Holsey-Hyman.

309.    Defendants' actions alleged herein constitute willful and wanton conduct.

310.    Defendants acted with ill will and common law malice in their defamatory, retaliatory, and other wrongful actions described herein.

311.    Defendants' actions of willful and wanton conduct, ill will, and common law malice will be established in other ways through discovery or trial.

312.    As a direct and proximate result of the willful and wanton conduct, ill will, and malice of Defendants, Dr. Holsey-Hyman has been damaged generally and specially in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

313.    An award of punitive damages is warranted to punish Defendants' egregious conduct and to deter Defendants and others from engaging in similar conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Dr. Holsey-Hyman demands judgment against the Defendants as follows:

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 58 of 68

1.    That Plaintiff have and recover against the Defendants all such monetary relief and equitable relief to which Plaintiffs may be entitled under the law, including but not limited to compensation for mental anguish, injury to reputation, injury to moral character, humiliation, embarrassment, severe emotional distress, medical and health expenses, loss of business, loss of income, loss of earnings capacity, loss of enjoyment of life, and other out-of-pocket expenses;

2.    That Plaintiff have and recover punitive damages against all Defendants,

3.    That judgment against Defendants bears interest from the time of the institution of this action or earlier as provided by law;

4.    That the costs of this action, including reasonable attorney's fees as allowed by law, be taxed against Defendants;

5.    That Defendants be ordered to issue a public retraction, apology, and removal of the false statements as contained herein;

6.    That the Court grant a trial by jury on all issues so triable; and

7.    For such other and further relief as may be deemed appropriate by the Court.

This the 5th day of March, 2024.

**LAW OFFICES OF COREY CARTWRIGHT, PA**


By: Corey C. Cartwright
Florida State Bar No. 0641928
1500 Beville Road, Suite 606
Daytona Beach, Florida 32114
Tel:    800-766-4679
Email: agoodattorney4u@yahoo.com
*Attorneys for Plaintiff to be admitted*
*Pro Hac Vice*

**DeMENT ASKEW JOHNSON & MARSHALL, LLP**


By: _____
James T. Johnson
N.C. State Bar No. 19087
Jonathan W. Martin
N.C. State Bar No. 49381
Post Office Box 711
Raleigh, North Carolina 27602
Tel:      919-833-5555
Email: jjohnson@dementaskew.com
            jmartin@dementaskew.com
*Attorneys for Plaintiff*

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 59 of 68



## CITY ATTORNEY
### CITY OF DURHAM



**Delivered by Email and Hand Delivery**

March 13, 2023

Mayor Elaine O'Neal (*Elaine.O'Neal@durhamnc.gov*)
Mayor Pro Tem Mark-Anthony Middleton (*Mark-Anthony.Middleton@durhamnc.gov*)
Councilmember Javiera Caballero (*Javiera.Caballero@durhamnc.gov*)
Councilmember DeDreana Freeman (*DeDreana.Freeman@durhamnc.gov*)
Councilmember Monique Holsey-Hyman (*Monique.Hyman@durhamnc.gov*)
Councilmember Jillian Johnson (*Jillian.Johnson@durhamnc.gov*)
Councilmember Leonardo Williams (*Leonardo.Williams@durhamnc.gov*)

    Subject: Reported Potential Legal and Ethical Violations on the Part of City Council

Dear Mayor, Mayor Pro Tem, and Members of the Durham City Council:

I write with deep concern about recently reported conduct by one or more members of the Durham City Council. Before I share what has been reported to me as the Durham City Attorney, first, let me make clear that my client first and foremost is the City of Durham—the municipal corporation as a legal entity. The North Carolina State Bar has promulgated a rule of professional conduct to guide attorneys when their client is an organization. That rule provides in relevant part as follows:

> If a lawyer for an organization knows that an officer, employee, or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, **or a violation of law** which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization. Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act on behalf of the organization as determined by applicable law.

N.C. Rules of Prof'l Conduct r.1.13(b) (N.C. State Bar 2017).

I conferred with City Manager Wanda Page regarding the information reported to me as City Attorney. Manager Page is the Chief Administrative Officer of the City of Durham and the highest authority, other than the City Council itself, who can act on behalf of the City of Durham. The Manager and I agreed that the best way to address this issue from the outset was for me to

101 City Hall Plaza, Second Floor, Durham NC 27    **EXHIBIT A**    DurhamNC.gov    Follow Us @CityofDurhamNC

provide this letter to the City Council, outlining the reported information as well as the potential legal ramifications of the conduct that has been reported. To be clear—my client is the City of Durham. While the Office of the City Attorney does sometimes represent members of the City Council in their official capacities, it is important that each of you understands that I do not serve as the _personal_ attorney for any member of the Durham City Council. As such, there is no attorney-client relationship with respect to the information that I am about to convey, and the information—as it was reported to me and now as I am sharing it with you—is not privileged information.

Over the weekend, I received a telephone call from Planning Director Sara Young. Director Young had been contacted by a developer who is working on projects in and around the City of Durham and who has recently submitted applications for annexation and/or rezoning for City Council consideration. The developer informed Director Young that they held a number of one-on-one meetings recently with members of the Durham City Council in an attempt to build support for one or more projects. The developer contends that during one of these meetings, the developer was informed that, in order to obtain support for their project (i.e. a 'yes' vote on the application), they would need to make a contribution to that councilmember's campaign.

I do not know if the foregoing allegation is true. It was reported to Director Young, who, in turn, reported it to me, and neither of us was in the subject meeting to witness the above-described exchange. However, as counsel for the City, I find it extremely alarming that such an allegation has been made about a member of the Durham City Council. If such a conversation did occur, the Councilmember involved committed a clear violation of the City's Ethics Policy. More importantly, the Councilmember who requested a campaign contribution in exchange for voting in a certain way, if that occurred, has violated N.C. Gen. Stat. 14-217, which is punishable as a Class F felony. I have attached a copy of this statute for your reference. Again, while I do not have a legal obligation to defend individual City Councilmembers in actions involving personal criminal conduct, it is reasonable to assume that if the developer were to file a civil action on the basis of alleged extortion or attempted extortion, the lawsuit would claim that those actions are imputed to the City. Further, allegations of extortion would likely cause a significant loss of public confidence in the City's overall handling of land use matters and legislative actions. I have a compelling professional obligation to protect the City of Durham from such collateral effects. It should go without saying that no member of the City Council should ever demand or accept anything of value in connection with engaging in any action or activity that is a part of the official duties of the office. I suggest that any Councilmember who has engaged in such activity consult their own personal lawyer.

Additionally, the developer who reported the above-described conversation to Director Young also reported that they believe that multiple members of the City Council are engaged in group chat or text thread discussions during public hearing deliberations. Again, I do not know if this alleged conduct is occurring. I have not personally seen such group chats or text threads during general public hearings. And while I do not believe these types of communications violate any criminal statute or the Open Meetings Law (particularly if three or fewer Councilmembers are participating on the text thread), Councilmembers "deliberating" by text or engaged in other electronic discussions during public hearings certainly do not comport with the spirit of the North Carolina Open Meetings Law. Councilmembers should also be advised that these types of text

communications, if they are occurring, are, in fact, public records and subject to request by the developer or other members of the public. If a properly-framed public records request is received, Councilmembers must comply and produce the subject texts.

Finally, Manager Page brought to my attention today the fact that a City employee was recently disciplined for engaging in campaign-related activities for a current City Councilmember while on the job. Councilmembers should be aware that City employees are strictly prohibited by N.C. Gen. Stat. 160A-169 (and by an internal personnel policy—HRM 705) from working on political campaigns while at work and/or while using City-issued property (e.g. paper, printers, computers). While 160A-169 and internal personnel policies do not apply to Councilmembers, Councilmembers are prohibited from using City resources for campaign related activities by N.C. Gen. Stat. 160A-499.3. I have attached copies of these two statutes as well as the personnel policy for your broader understanding. My hope is that Councilmembers will appreciate the sensitive position of City employees and refrain from requesting that City staff engage in campaign related activities while working in an official role for the City and/or using City-issued property.

Thank you so much for your careful attention to the matters discussed in this letter.

With kind regards,

Kimberly M. Rehberg
City Attorney

Enclosures:  N.C. Gen. Stat. 14-217
             N.C. Gen. Stat. 160A-169
             COD Policies HRM-705 & HRM-805
             N.C. Gen. Stat. 160A-499.3

Cc:   Wanda S. Page, City Manager
      Diana Schreiber, City Clerk

**From:** Rehberg, Kimberly <Kimberly.Rehberg@durhamnc.gov>
**Sent:** Tuesday, March 14, 2023 4:42 PM



**To:** City Council Only <CityCouncilOnly@durhamnc.gov>
**Cc:** Page, Wanda <Wanda.Page@durhamnc.gov>; Schreiber, Diana <Diana.Schreiber@durhamnc.gov>
**Subject:** RE: Reported Potential Legal and Ethical Violations on the Part of City Council

Dear Mayor, Mayor Pro Tem, and Members of the Durham City Council:

As stated in my letter yesterday, my purpose in sharing what was reported to the Planning Director (who in turn passed along the information to me) was to take action that I found to be reasonably necessary to protect and advance the best interests of the City of Durham. By sharing the information with the Council, my intent was to make clear that the alleged conduct should not be imputed to the City of Durham, to preserve public confidence in the City's processes, and to demonstrate for the public that allegations of corruption are not simply "buried" if they are presented to the professional staff. I think City Manager Page and I were completely aligned on these objectives.

I had a conversation with Mayor O'Neal this morning regarding this information, which is now in the hands of the City Council. She asked me how the Mayor, how the Council, should respond to that information. I cannot outline for the Council specifically what the response should be. I will say that, given that Manager Page and I agreed that we had an obligation to disclose the issues to the City Council as soon as we learned of them, so, too, the City Council should take the reported allegations very seriously and act with all due haste to address them. **The City Council should be concerned about the threats to the integrity of its work and to public confidence posed by allegations of corruption. It is unlikely that a developer would report conduct that has no factual basis or to maliciously cause harm, particularly a developer who regularly brings matters before the City.**

While I am not in a position to direct an investigatory process for the City Council, and it is not my role to determine what the outcome of any investigation should be, I do think that the City Council's response should be to conduct its own diligent, good faith investigation into the allegations with great urgency. Ideally, the City Council would be able to investigate this issue before holding development project public hearings again, which it is scheduled to do on March 20th. In terms of how the investigation might be structured, the Council might start by having conversations internally in small groups to try to definitively identify the Councilmember alleged to be involved and get a fuller understanding of the reported incident. As always, in having small group discussions, the Council should be careful not to create a quorum.

A more streamlined approach might be to have the Mayor and the Chair of the Council Procedures Committee meet with each Councilmember to determine if any Councilmember has factual knowledge about the alleged incident. If the City Council can internally substantiate the reported incident, then an inquiry might entail confirming the identity of the reporting developer and having a direct conversation with the developer, as well. If a Councilmember confirms factual knowledge of the alleged

EXHIBIT

*B*

tabbies

incident, and the Council needs additional time to talk to the developer and others regarding the incident, any Councilmember confirming that they are implicated by the developer's allegations could, in the interests of protecting the integrity of the City, request an excused absence for the meeting on Monday, March 20th. The City Council would then have more time to work through the allegations and gather sufficient information to determine what, if any, additional action should be taken by the City Council.

While it would be ideal if the City Council could hold a closed session to have a conversation as a group and inquire into the matter collectively, unfortunately the closed session statute (N.C. Gen. Stat. 143-318.11, attached), specifically states that any conversation regarding the competence, performance, character, or fitness of a member of the Council must be held in an open meeting.

I hope the suggestions made above are helpful to the Council in figuring out a way to respond to the information that it has received.

Have a good evening,

Kim

**Kimberly M. Rehberg, City Attorney**
**Pronouns: She/Her/Hers (Why Pronouns Matter)**
**101 City Hall Plaza**
**Durham, North Carolina 27701**
**Phone: 919.560.4158 ext. 13246**
**Direct Dial: 919.354.2716**
**Fax: 919.560.4660**
**Kimberly.Rehberg@durhamnc.gov**

*E-mail correspondence to and from this sender may be subject to the North Carolina Public Records Act and can be disclosed to third parties.*



# RESOLUTION OF CENSURE OF COUNCIL MEMBER MONIQUE HOLSEY-HYMAN

**WHEREAS**, Council Member Monique Holsey-Hyman was appointed to serve as a member of the Durham City Council on May 5th, 2022; and

**WHEREAS**, as a Council Member, Council Member Hyman is expected to uphold the public trust of the residents of the City of Durham by following all federal, state, and local laws and well as City policies; and

**WHEREAS**, North Carolina General Statute 160A-169 prohibits city employees from engaging in partisan or political activity in the workplace or with city resources, and from using their official authority or influence for the purpose of interfering with or affecting the result of an election; and

**WHEREAS**, City of Durham HR Policy #705 prohibits city employees from engaging in partisan or political activity while on-duty or with city resources, and from engaging in partisan or political activity which would represent a conflict of interest or which would compromise the employee's role of impartiality in his/her position; and

**WHEREAS**, in September of 2022, Council Member Hyman asked a city staffer to do campaign-related research for her while on duty. After this incident, during a meeting with the staffer and her supervisor, the city policy regarding campaign activity was clearly communicated to Council Member Hyman; and

**WHEREAS**, in January of 2023, Council Member Hyman asked a city staffer to do work related to her political campaign. In March, the city staffer was formally disciplined for engaging in campaign activity for Council Member Hyman while on duty and using city resources.

**NOW, THEREFORE, BE IT RESOLVED**, that the City Council of the City of Durham hereby censures Council Member Monique Holsey-Hyman for her conduct and condemns her actions as not meeting the standards expected of members of the City Council and leaders of the City of Durham.

Adopted this 23rd day of March, 2023.



EXHIBIT
C



SATANA DEBERRY
DISTRICT ATTORNEY

PROSECUTORIAL DISTRICT 16
DURHAM COUNTY

510 S. DILLARD ST, 8TH FLOOR, DURHAM, NC, 27701
O   919-808-3010
F   919-808-3034



<u>VIA EMAIL</u>

September 19, 2023

Kimberly Rehberg
City Attorney
City of Durham

Wanda Page
City Manager
City of Durham

Mayor and City Council
City of Durham

**Re: Investigation of allegations against Monique Holsey-Hyman**

To All It May Concern:

On March 27, 2023, I asked the NC State Bureau of Investigation (SBI) to open an inquiry into allegations made at the March 23, 2023, Durham City Council meeting. As with any investigation, an allegation or inquiry is not on its own confirmation of a violation of the law.

<u>BACKGROUND</u>
On March 13, 2023, City Attorney Rehberg sent a letter to the Mayor and City Council outlining a phone conversation with Durham Planning Director Sara Young. Director Young informed Attorney Rehberg that she had been contacted by a local developer about concerning interactions with a council member. The developer, later identified as Jarrod Edens, alleged that Council Member Monique Holsey-Hyman had solicited a campaign contribution from him to secure her 'yes' vote on annexation and rezoning applications pending before Council.

Attorney Rehberg's letter stated her alarm at the allegation and informed Council that if said allegation were true, it was at least a violation of the City's Ethics Policy and at worst, a crime punishable as a Class F felony under NC law. Unsurprisingly, this letter set off alarms and a flurry of telephone and electronic communication between and amongst the Mayor, council members and staff. The communications resulted in suggestions of sanctions and investigations and a public statement read by the Mayor at the March 23, 2023, Durham City Council meeting. After tempers flared during the meeting, council members were recorded by a local media outlet arguing and cursing behind the council dais.

<u>INVESTIGATION</u>



North Carolina Judicial Branch

Page **1** of 3



SATANA DEBERRY
DISTRICT ATTORNEY

PROSECUTORIAL DISTRICT 16
DURHAM COUNTY

510 S. DILLARD ST. 8TH FLOOR, DURHAM, NC, 27701
O   919-808-3010
F   919-808-3034

I learned of the allegations when I received a phone call from SBI Special Agent in Charge Sheila Minchew on March 17, 2023. SAIC Minchew informed me that she had been contacted by Attorney Rehberg at the request of Mayor Elaine O'Neal to investigate allegations of extortion or bribery on City Council. As NC law only allows law enforcement agencies or the elected District Attorney to request an SBI investigation, SAIC Minchew called to ask my direction on the matter. After discussing the allegations and available evidence extensively with SAIC Minchew and Attorney Rehberg and given the hearsay nature of the allegations, I declined to request an investigation into the matter at that time.

However, after the events at the Council meeting on March 23, 2023, the now very public nature of the allegations and the increasingly speculative nature of media reporting, I made a request of the SBI to open an investigation on March 27, 2023.  I also requested that the SBI investigate additional allegations that Holsey-Hyman had improperly solicited a City of Durham employee to engage in campaign activities on city time.

## RESULTS OF SBI INVESTIGATION

On September 15, 2023, I received the report of Special Agent N. Deming of the SBI Professional Standards Division on the allegations against Council Member Holsey-Hyman.

SA Deming conducted interviews with City of Durham Mayor, Council Members, and staff. Amongst that group, every person with whom he requested an interview consented – including Holsey-Hyman. SA Deming interviewed Holsey-Hyman at length. She not only willingly answered his questions, but she also voluntarily provided documentation of her conversations with the developer, Jarrod Edens. SA Deming reviewed text messages between Holsey-Hyman and Edens and found nothing improper. In fact, Deming noted that Holsey-Hyman remained courteous, respectful, and forthcoming during a very stressful set of circumstances.

Jarrod Edens, on the other hand, avoided every attempt SA Deming made to interview him. Edens did not answer calls nor return messages left by SA Deming. When Deming did get him on the phone, Edens agreed to an interview and then did not appear.  Afterwards, Deming was contacted by an attorney retained by Edens. To allay Edens' concerns about an in-person interview, Deming agreed to accept a written statement from Edens and his attorney. Edens agreed but ultimately failed to provide such a written statement. During the time in which Edens was avoiding an interview with the SBI, the development issue under question came back up for a vote before Council and was approved without participation by Holsey-Hyman. According to Deming, after the vote, Edens showed no interest in either repeating or pursuing his initial allegations made to Planning Director Young.

As to the allegation that a city staffer engaged in campaign activity, Deming was able to interview the employee in question. According to the employee, they volunteered information to Council Member Holsey-Hyman. She did not request it either directly or indirectly. The employee received a written reprimand for providing the information.

——————————————— ☆ ☆ ☆ ———————————————



SATANA DEBERRY
DISTRICT ATTORNEY

PROSECUTORIAL DISTRICT 16
DURHAM COUNTY

510 S. DILLARD ST, 8TH FLOOR, DURHAM, NC, 27701
O 919-808-3010
F 919-808-3034

## RECOMMENDATION

Given the results of the SBI investigation, there is no probable cause to pursue charges against Council Member Holsey-Hyman. In fact, the SBI was unable to discover any credible allegations against her at all. There is no evidence that she solicited a campaign contribution from Jarrod Edens or that she attempted to extort anything from him in exchange for her vote on his development project. There is also no evidence that Holsey-Hyman solicited campaign work from a city employee. Additionally, there is also no evidence that there was a coordinated effort led by any other Council Member to initiate allegations against Holsey-Hyman.

Based on the available facts and further interviews, there is no reporting party with any credible information in this matter. As far as state criminal issues are concerned, this matter is closed.

Sincerely,

Satana Deberry
District Attorney, 16th Prosecutorial District

cc.  SA N. Deming, NC SBI
     Ryan Willis, DysartWillis

☆ ☆ ☆

Case 1:24-cv-00296   Document 1-1   Filed 04/03/24   Page 68 of 68